No. 27455

**Philip F. DiLeo v. The Board of Regents of the University of Colorado, Fred Betz, Sr., Geraldine Bean, Dale Atkins, Eric W. Schmidt, Thomas S. Moon, Jack Kent Anderson, Raphael J. Moses, Robert M. Gilbert, and Byron Johnson, as members of the Board of Regents of the University of Colorado, Roland C. Rautenstraus, President of the University of Colorado, Courtland H. Peterson, Dean of the University of Colorado School of Law, James N. Corbridge, Jr., Vice-Chancellor for the Academic Affairs and member of the Committee on Admissions, University of Colorado School of Law, Alex Kuo, Assistant Vice-Chancellor for Academic Affairs, University of Colorado, Pearl I. Colvin, Assistant Dean for Admissions and Placement, University of Colorado School of Law, and William E. Rentfro, Director, Special Academic Assistance Program, University of Colorado School of Law**

(590 P.2d 486)

Decided August 28, 1978.

David J. Ternlund, for plaintiff-appellant.

Richard A. Tharp, for defendants-appellees.

Donald O. Kinonén, John W. Finley, Jr., Brashich and Finley, Michael Blinick, for amici curiae, the Committee on Academic Nondiscrimination and Integrity and Mountain States Legal Foundation.

*En Banc.*

MR. CHIEF JUSTICE PRINGLE delivered the opinion of the Court.

This case involves a challenge to the constitutionality of the Special Academic Assistance Program (S.A.A.P.) as established and administered by the University of Colorado School of Law.

The law school's program is set forth in article 6 of the Rules of the law school. Rule 1-6-2(c)(ii) establishes the standards for eligibility for the program and reads in pertinent part as follows:

"[A] program designed to identify prospective law students who appear to have the intellectual ability to graduate from this law school but would not otherwise be eligible for admission under normal admission standards, and who are members of *identifiable groups which have not had adequate educational and cultural opportunities available to them and which are seriously underrepresented in the legal profession.* It is understood that Negroes, Mexican-Americans and American Indians are such groups, members of which may be expected to constitute most, if not all, the participants in this program. It is not intended, however, to preclude participation by members of other identifiable groups which are shown to fit within the standards set forth in the first sentence of this subsection." (Emphasis added.)

Groups which meet the listed criteria are selected by reviewing various materials, primarily census bureau data, which reflect such

information as median and per capita income, education level and representation in the legal profession. Both national and regional figures, when available, are reviewed. Regional figures in particular are used in assessing representation in the legal profession.

Using this method of review, the law school determined in 1974 that Asian Americans and Italian Americans did not fit the program's criteria, at that time. The group of Italian Americans was defined as foreign born or native born with one foreign born parent.

In 1975, it was determined that Cubans and Hawaiians were not to be included in the program but that Puerto Ricans would be included.

Applicants for the S.A.A.P. are screened to determine whether they are members of an eligible group. The S.A.A.P. is a competitive admissions program for those eligible and both subjective and objective criteria are used in evaluating eligible applicants.

The approximate number of students to be admitted is determined in advance, based on available facilities. This predetermined number of spaces is only filled if there are qualified applicants available. We do not here determine whether this use of a predetermined number affects the constitutionality of the program because we decide the case on another issue.

Plaintiff DiLeo applied for admission to the law school through the S.A.A.P. for the entering class of 1973 and subsequently for the entering class of 1974. In both years, the application was rejected on the basis that he was not a member of an identifiable group having inadequate educational and cultural opportunities and seriously underrepresented in the legal profession. Following these two rejections, DiLeo brought this action in the District Court of Boulder challenging the S.A.A.P.

The trial court in granting the law school's motion for summary judgment, held that DiLeo did not have standing to challenge the constitutionality of the program itself since if there were no S.A.A.P. he would not have been admitted to the law school. The trial court, stating that DiLeo could only challenge the exclusion of his group from the program, also held that the law school had not acted arbitrarily or capriciously in excluding the group of which DiLeo was a member from eligibility in the program.

The case is now before us on appeal and we affirm the trial court's ruling to the extent it holds that DiLeo's application was properly rejected for consideration in the S.A.A.P.

The case before us presents a sensitive and complex issue, an issue the resolution of which has important moral and social consequences. The law school has established the S.A.A.P. to increase minority enrollment and minority representation in the legal community. Similar programs have been established by colleges and universities throughout the nation to remedy the effects of past societal discrimination.

DiLeo claims that the program as established and operated by the School of Law of the University of Colorado is unconstitutional. He argues that while a program for the disadvantaged is itself constitutional, the S.A.A.P. as administered by the law school is unconstitutional in that it operates to exclude persons solely on the basis of their race or ethnic background. Specifically, he argues that he being of Italian American heritage and a product of slum schools, was educationally, socially and economically disadvantaged and should have been considered an eligible applicant for the S.A.A.P.

The essence of Plaintiff's Fourteenth Amendment argument is that the law school violated his right to equal protection of the laws by denying him admission to the law school while admitting applicants who he claims were similarly situated.

While this case was pending before us, the United States Supreme Court issued its decision in *Regents of the University of California v. Bakke,* _____U.S. _____, 98 S.Ct. 2733, _____L.Ed.2d _____(1978). In *Bakke,* the Court reviewed a challenge to the validity of a medical school's special admissions program. The result of this review was that the Medical School of the University of California at Davis was ordered to admit Alan Bakke to the school.

Alan Bakke, a white male, alleged that the special admissions program operated to exclude him on the basis of his race in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, a provision of the California Constitution, and §601 *et seq.* of Title VI of the Civil Rights Act of 1964. The *Bakke* case reached the Court in a posture where Alan Bakke was considered qualified for regular admission and would have been admitted to the medical school but for the special admissions program.

There was no majority opinion of the Court in the *Bakke* case. Only five of the Justices actually addressed the constitutional issue. Four of these Justices (Brennan, White, Marshall and Blackmun) found that the special admissions program did not violate the Constitution. These Justices concluded "that Davis' goal of admitting minority students disadvantaged by the effects of past discrimination is sufficiently important to justify use of race-conscious admissions criteria." _____U.S at _____, 98 S.Ct. at 2789, _____L.Ed.2d at _____(1978).

Mr. Justice Powell, who announced the judgment of the Court, found

that the special admissions program served a compelling state interest[1] but that a racial ''quota'' was not necessary to achieve this interest. However, he did determine that the competitive consideration of race and ethnic origin might properly be a part of an admissions program.

Mr. Justice Stevens, in an opinion joined by Chief Justice Burger, Mr. Justice Stewart and Mr. Justice Rehnquist, determined that Title VI applied and that Bakke was excluded from the medical school in violation of Title VI. These Justices did not reach the constitutional issue of whether race can ever be a factor in an admissions policy. Whether in the absence of Title VI considerations, or given an amended version of Title VI, any of these Justices might join the Fourteenth Amendment conclusions of Justices Brennan, Marshall, White and Blackmun is yet to be decided.

The law school asserts that the decision in *Bakke* does not mandate DiLeo's admission to the law school. We agree.

■ The threshold question to be addressed is whether DiLeo has standing to challenge the constitutionality of the S.A.A.P. The general rule as developed in Colorado is that a person to have standing to challenge the constitutionality of state actions must be personally adversely affected by the particular constitutional defect asserted. *E.g., People v. Stage,* 195 Colo. 110, 575 P.2d ·423 (1978); *Garcia v. City of Pueblo,* 176 Colo. 96, 489 P.2d 200 (1971); *People v. Stark and Peacock,* 157 Colo. 59, 400 P.2d 923 (1965). The following language from *McKinley v. Dunn,* 141 Colo. 487, 492, 349 P.2d 139, 142 (1960) is instructive in this regard:

"We follow the generally accepted rule that constitutionality is to be considered only in the light of the standing of the party who seeks to raise the question and that a person may challenge the constitutionality of a statute *only when and as far as it is being or is about to be applied to his disadvantage. Cross v. Bilett,* 122 Colo. 278, 221 P.2d 923." (Emphasis added.)

■ The trial court's finding that DiLeo had no standing was based

---

[1] Powell found that the attainment of a *diverse student body* was compelling in the context of a university's admissions program. The United States Supreme Court has previously recognized the importance of this goal. In *Sweatt v. Painter,* 339 U.S. 629, 634, 70 S.Ct. 848, 850, 94 L.Ed. 1114, 1119 (1950), that Court stated:

"Moreover, although the law is a highly learned profession, we are well aware that it is an intensely practical one. The law school, the proving ground for legal learning and practice, cannot be effective in isolation from the individuals and institutions with which the law interacts. Few students and no one who has practiced law would choose to study in an academic vacuum, removed from the interplay of ideas and exchange of views with which the law is concerned. . . .[W]ith such a substantial and significant segment of society excluded. . . we cannot conclude that the education offered . . . is substantially equal. . . ."

*Accord, Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *DeFunis v. Odegaard,* 82 Wash.2d 11, 507 P.2d 1169 (1973), *vacated as moot,* 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

on its view that in effect there would be no remedy available for DiLeo even if the court agreed with his allegations of unconstitutionality. We agree.

Initially we note that Philip DiLeo is not in a similar position to Alan Bakke in that "but for the existence of the special program" Bakke would have been entitled to the educational benefit of admission to medical school. It is clear from the record that DiLeo would not have been eligible for admission to the University of Colorado School of Law under normal admissions standards.[2] Thus even *if* the S.A.A.P. were unconstitutional in respect to an applicant who like Bakke would have been admitted if there were no special admissions program, DiLeo is not situated so as to make that challenge.

In fact, DiLeo does not want the special admissions program to be declared unconstitutional. Rather, he wants it to be redrawn along non-racial lines. The program as established by the law school is drawn along group lines. For example, one of the principal criteria of the program is that the applicant be a member of a *group* which is underrepresented in the legal community. DiLeo asks us to declare unconstitutional this group aspect of the program. But this would be in effect to strike down the program as presently constituted. It is not the proper function of a court to establish an admission program for a university, nor to rewrite the program according to its own notions. Thus the import of DiLeo's argument would be to leave the university with no special admissions program. Since DiLeo would not be admitted through the regular admissions program, a successful challenge to the program's constitutionality would leave DiLeo's position unchanged.

Our holding in *Lee v. People,* 170 Colo. 268, 460 P.2d 796 (1969), is applicable at this point. In *Lee* we noted that the defendant had no standing to raise an equal protection argument because the "[d]efendant could not benefit in any way by such a ruling here and, therefore, is in no position to raise the issue in this case." 170 Colo. at 273, 460 P.2d at 799. DiLeo is in this same position. He cannot benefit from a ruling that the special admissions program is unconstitutional; therefore, he has no standing to raise that issue.

We affirm the ruling of the trial court.

MR. JUSTICE ERICKSON dissents.

MR. JUSTICE CARRIGAN does not participate.

---

[2] In fact it is not clear that even if DiLeo had been considered eligible for the S.A.A.P. he would have been admitted. In 1973, of 59 applicants who were offered admission through the S.A.A.P., 50 had higher prediction indexes than DiLeo and 24 applicants who were members of eligible groups and had higher prediction indexes than DiLeo were denied admission. (A prediction index is a composite factor which is derived by combining in a mathematical formula (1) the applicant's grade point average, (2) a quality rating of the applicant's degree school, (3) the applicant's LSAT score, and (4) the applicant's writing ability score.)

MR. JUSTICE ERICKSON dissenting:

I respectfully dissent. In my view, the record demonstrates an injury to DiLeo that is likely to be redressed by a favorable decision on his behalf. *Regents of the University of California v. Bakke,* ____U.S. ____, 98 S.Ct. 2733, 2743-44 (n. 14), ____L.Ed.2d ____(1978) (Powell, J.); *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

Guided by *Bakke,* which admittedly reflects diverse and divergent views of the Justices of the Supreme Court of the United States and provides definitive guidelines in only the most ephermeral sense, I would hold that the University of Colorado School of Law Special Academic Assistance Program (S.A.A.P.) is unconstitutional.

## I.
### *Standing*

The trial court ruling which we are called upon to review assumed (1) DiLeo was denied admission because his group was not designated, and (2) had his group been designated, he would have been admitted as a student.

The trial court did not rule upon the constitutionality of the S.A.A.P. on the theory that even if the program were unconstitutional, DiLeo lacked standing to challenge the program because he was not qualified for admission under the general admission standards.

As the majority opinion points out, this case differs from the *Bakke* fact situation in that Bakke would have been admitted but for the special admissions program at the University of California at Davis Medical School. Here, DiLeo claims that he was entitled to be considered for admission under the S.A.A.P. Under Law School Rule 106-2(c)(ii), students are admitted to the S.A.A.P. who are members of identifiable groups (1) which are seriously underrepresented in the legal profession and (2) which have not had adequate educational and cultural opportunities available to them. In both 1973 and 1974, the years when DiLeo applied for admission under S.A.A.P., 29 places in the law class of 175 were allocated in advance to the program. Only those who were Mexican-Americans, Black-Americans, and American Indians were considered for those places in 1973. On August 1, 1974, Puerto Rican-Americans were added, but Asian-Americans and Italian-Americans were declared ineligible.

DiLeo asserts that he comes from a background which is characterized by indicia of deprivation as severe as that faced by the designated minorities. Specifically, he has established that he grew up in New York's "Little Italy," a slum inflicted with crime, drugs and violence; that he was raised by uneducated, working class parents; and that, through his secondary education, he attended slum schools beset by ignorance and indifference. As such, he claims that he must surmount difficulties as great as those faced by those minorities given preference.

DiLeo is not asserting that it is unconstitutional for the Law School to have a S.A.A.P. to aid disadvantaged students, but claims he is disadvantaged and that his background qualifies him for consideration. As such, he asserts that he would be eligible for admission under the S.A.A.P. if non-racial criteria were applied, and that he has been denied meaningful participation in that program because of his race. The majority points out, at note 2, that:

"In 1973, of 59 applicants who were offered admission through the S.A.A.P., 50 had higher prediction indexes than DiLeo and 24 applicants who were members of eligible groups and had higher prediction indexes than DiLeo were denied admission."

From this, the majority draws the conclusion that, even if DiLeo were considered in the special admissions program, he would not have been accepted by the Law School.

The majority's reference to this finding indicates that it misapprehends the import of *Bakke*. Nine persons who were participants in a program, from which DiLeo was excluded on the basis of his race, were less qualified and were not only considered, but also were offered admission to the Law School. Thus, it is unnecessary that DiLeo claim that he would have been admitted under the general admissions program and in the absence of the University of Colorado's S.A.A.P. It is sufficient for purposes of standing that DiLeo establish that he was not considered as a disadvantaged student under the S.A.A.P. because he was not a member of a designated minority.

Moreover, I am persuaded that once it was shown that DiLeo was excluded from the S.A.A.P. because of his race the burden of proof shifted to the University of Colorado to demonstrate that DiLeo would not have been accepted if he had been considered for admission under the S.A.A.P. In short, the University would have to demonstrate that DiLeo would not have been considered for admission under the S.A.A.P. even if that program did not use race as a decisive factor. *Bakke v. Board of Regents,* 18 Cal.3d 34, 553 P.2d 1152, 1172 (1976); *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 773 (n. 32), 96 S.Ct. 1251, 47 L.Ed.2d 444 (1975).

## II.
### Suspect Classification

The issue common to both *Bakke* and this case is whether a racial classification which is intended to assist minorities, but which has the effect of depriving those not so classified of benefits they would enjoy but for their race, invokes the "compelling state interest" or only an "important governmental objectives" test. Only the Supreme Court of the United States can pronounce the final words on that question. *See Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975). A majority of the Justices of that Court have yet to pronounce that word. *See Bakke,*

*supra* at 2756-60, 64 (Powell, J.); *id.* at 2783-84 (Brennan, White, Marshall, and Blackmun, J.J.) (concurring in part and dissenting in part). However, at the present time, in order to meet the requirements set forth by Justice Powell, we must assume that the University must demonstrate a compelling state interest in maintaining its program and that no less restrictive method will effect its purpose.

The University cannot meet that burden in this case. The S.A.A.P. administered by the Law School is essentially and fatally similar to that established by the Medical School at Davis. The crucial fact is that both Bakke and DiLeo were denied meaningful participation in at least some major facet of the admissions program solely on the basis of their race.

Once it has been demonstrated that the S.A.A.P., as administered, created a *per se* racial classification, *Bakke* requires that the strict scrutiny test be applied. If the program affects a fundamental interest or employs a suspect classification, strict scrutiny is invoked, and the program can be upheld only if it is necessary to promote a compelling state interest, and that interest cannot be promoted by less onerous means. *E.g., Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *McLaughlin v. Florida,* 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

Race is a key to admission under S.A.A.P. because only members of specially selected racial groups are entitled to admission at the lower standards. Race is conclusive for purposes of excluding certain applicants, such as DiLeo, from participation. While students are not being admitted solely on the basis of race, it is clear that some potential students, including DiLeo, have been excluded from participation in the S.A.A.P. solely on that basis. The fact, relied upon by the majority, that S.A.A.P. applicants found to belong to the appropriate racial groups must compete among themselves for available positions and that several objective factors are considered in the admission process is irrelevant to DiLeo's constitutional challenge.

DiLeo does not challenge the establishment of a program to give preference to disadvantaged individuals. Nor does he challenge the University's reliance on its belief that the fact that an individual is a member of an identifiable, disadvantaged group makes it more probable that a member of that group is disadvantaged. Nothing in the *Bakke* opinion prevents the Law School from making that judgment. Justice Powell makes clear, however, that the University must define those groups it designates as disadvantaged in racially neutral terms. That is, when the Law School designates a minority group, the members of which it wishes to prefer, it may not designate that group by reference to its racial characteristics.

For the reasons stated herein, DiLeo, in my opinion, has standing to challenge the S.A.A.P. S.A.A.P. creates a *per se* racial classification

which is prohibited and must fail because of the limitations imposed by *Bakke v. Regents of the University of California, supra.*