The STATE BOARD FOR COMMUNITY COLLEGES AND OCCUPATIONAL EDUCATION and Ellin Mrachek, Angelo M. Daurio, Stephen J. DeJong, Ross Forney, Thomas T. Grimshaw, Richard O. Jones, Gwendolyn A. Thomas, Fred W. Valdez, Jr., Kirk Wagner, Members of The State Board for Community Colleges and Occupational Education; The Pikes Peak Community College Council and Norman Pledger, Betty Diatt, Mildred Guy, Jerry Jones, James Lunghofer, Members of the Pikes Peak Community College Council; The Pikes Peak Community College Student Senate and Jeff Johnson, Carl Davis, Jane Wertz, Pam Shaver, Cheryl Shaver, Cathy Shaver, Fred Skinner, Alvin Wilson, Dee Steinbaugh, Members of the Pikes Peak Community College Senate; and Donald W. McInnis, John Rodwick and Robert Henry, Members of the Administration of Pikes Peak Community College, Petitioners,

v.

Judith OLSON, Respondent.

No. 82SC271.

Supreme Court of Colorado.

Aug. 20, 1984.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Joel W. Cantrick, Sol. Gen., Jo Ann Soker, First Asst. Atty. Gen., Bruce Pech, Asst. Atty. Gen., Denver, for petitioners.

Hobbs/Bethke & Associates, Larry F. Hobbs, P.C., William P. Bethke, Denver, for respondent.

QUINN, Justice.

We granted certiorari to review the decision of the court of appeals in *Olson v.* *State Board for Community Colleges and Occupational Education,* 652 P.2d 1087 (Colo.App.1982), in order to consider whether a journalism teacher who also served as faculty advisor to a student newspaper at a community college has standing to raise First Amendment challenges to the termination of funding for the newspaper. The plaintiff-respondent, Judith Olson, along with three student members of the newspaper staff, sought injunctive relief under 42 U.S.C. § 1983 against various defendants in their individual and official capacities. The district court entered a summary judgment in favor of the defendants because, in its view, Olson failed to establish injury to her First Amendment interests and was not entitled to assert the constitutional interests of nonparty students. The district court also ruled that the three student plaintiffs lacked standing because they failed to establish any injury in fact to their First Amendment interests. Olson appealed the summary judgment to the court of appeals. Addressing only Olson's individual First Amendment claims and declining to resolve the issue of third party standing, the court of appeals reversed the summary judgment and held that Olson had established an injury to her First Amendment interests and thus had the requisite standing to seek injunctive relief against the defendants with respect to the termination of funding for the student newspaper. We reverse the judgment of the court of appeals as to those issues relating to Olson's First Amendment claims. We conclude, however, that Olson should be permitted to assert the students' First Amendment interests and, therefore, reverse that part of the summary judgment denying her third party standing and remand the case for further proceedings.

I.

During the events in question, which occurred in 1979 and 1980, Judith Olson was a journalism instructor in various courses at Pikes Peak Community College, a two-year college offering unrestricted admissions for high school graduates and stu-

dents with comparable qualifications.[1] In addition to her teaching functions, Olson served as faculty advisor to the student newspaper, the *Pikes Peak News (News)*. Publication of the *News* was, according to Olson's deposition testimony, a cocurricular activity that provided her with a "motivational device" for her newspaper design classes and offered student staff members an outlet for student expression and an opportunity for practical application of classroom theory. The articles published in the *News* included those submitted by both journalism students and other student and nonstudent sources. Olson's role as faculty advisor consisted of monitoring printing costs and advertising revenue resulting from publication, and of reviewing articles for possible libel and obscenity. Exclusive of these functions, Olson exercised no control over the content of the student newspaper.

The budget for student activities was funded from mandatory student activity fees. The category of "student activities" included such functions as the student government, the student newspaper, and several student clubs. Funds were allocated for these student activities by the student senate, which acted with the approval of the college administrators. On June 1, 1979, the student senate met to consider proposed budget allocations for the 1979–80 school year. Although $12,456 had been tentatively allocated to the *News* by the student senate budget committee, the senate at the June 1 meeting voted to cut off all funding for the *News*. The funding cutoff was apparently prompted by a feeling that the content of the *News* was not representative of the views of the student body as a whole.[2]

During the summer of 1979 the student senate offered the *News* a $5,000 subsidy for the 1979–80 school year. The subsidy was conditioned on $1,000 free advertising for student government, the publication of a limited number of issues, and the drafting of a constitution for the *News*. The newspaper staff, determining that the proposed subsidy was inadequate to cover operational costs, refused the offer.

Publication of the *News* ceased with the student senate's funding decision of June 1, 1979. However, throughout the 1979–80 academic year students published an alternative publication, the *Pikes Peak Fuse (Fuse)*. The *Fuse*, a lower cost publication than the *News*, had a magazine-type format rather than the typeset newspaper format of the *News*. The *Fuse* was funded entirely from advertising revenues and $950 from the college's operational budget. Olson, who continued in the role as faculty advisor, modified her design class from one of newspaper design to one of magazine design in order to take advantage of the

---

1. Section 23–60–205, 9 C.R.S. (1973), states:
 "The general assembly shall create by law such community and technical colleges in this state as in its judgment are necessary. All such colleges shall be two-year colleges and shall not be four-year baccalaureate institutions. They shall have unrestricted admissions for high school graduates or students with comparable qualifications. In addition, any person, regardless of any previous academic experience, may be enrolled in any courses which he can reasonably be expected to successfully complete."

2. The minutes of the student senate indicate that the motion to terminate funding was based on the belief of various student senate members that the *News* was no longer a "student" newspaper. One senate member, Frank Skinner, stated in his deposition that the funds were cut because the *News* "seemed to be biased and ... it seemed to be serving the [*News'*] function other than the students' function." Carol Davis, another senate member and also a staff member of the *News*, was of the opinion that the funds were cut because "[the senate] felt that it was too expensive and that a lot of students did not want to spend that much of their student fees for the newspaper." Although Davis believed the *News* was a "pretty good paper," she listed the following factors as bearing on the alleged student discontent with the paper:
 " [T]hey were always down on the school and they never printed any happy news. They drug out subjects that really did not need to be drawn into depth. You know, they just kept saying the same things over and over, and that there were some misquotes and outright lies in the paper."

opportunities for practical experience presented by the *Fuse*.[3]

In August 1979 Olson and three student members of the 1978–79 *News* staff, Marti Dyer-Allison, Marie Moon, and Vicki Evans, filed a complaint against the State Board for Community Colleges and Occupational Education, the Pikes Peak Community College Council, the Student Senate, the individual members of these bodies, and three college administrators.[4] The complaint, which was based on an alleged violation of the federal civil rights statute, 42 U.S.C. § 1983, alleged that the student senate, acting pursuant to the authority which the other defendants had granted it, terminated funding for the *News* because of the senate's disapproval of the content and editorial policies of the *News*. Asserting that the publication of the *News* provided a practical training vehicle for students in the journalism department and served "as a forum and outlet for student expression," the plaintiffs claimed that the funding cutoff violated their rights to freedom of the press, speech, and association in the academic community, as guaranteed by the First and Fourteenth Amendments to the United States Constitution. Olson and the student plaintiffs sought injunctive relief to prohibit the funding cutoff and to restore funding at $12,400.

Although Olson's complaint was not precisely cast in terms of third party standing, her deposition testimony leaves no doubt that she was asserting the First Amendment rights of students at Pikes Peak Community College. She testified, for example, as follows: that the funding cutoff "had rather severe implications for students as well as the program;" that "if your students are not allowed to have the experience of successfully incorporating their skills development with practical experience simply because of the disagreement of content, that certainly speaks to the First Amendment;" that "I don't think I can separate myself and what was done from the students because the program and the publication [were] interrelated [and] I don't think they are two separate things;" and that "I am also Plaintiff in this case because I believe in the First Amendment and I believe that cutting off funds is the final act of censorship on the student publication or any publication." Indeed, the defendants and the district court treated Olson's complaint as including not only claims on her own behalf but also a third party claim on behalf of the First Amendment interests of students.[5]

The district court granted the defendants' motion for summary judgment on the ground that Olson and the other plaintiffs lacked standing to challenge the funding cut. The court ruled that Olson, as faculty advisor, had no constitutional right to exercise control over the content of the *News* and no constitutional right to use the *News* as a teaching tool and, hence, the funding cut did not cause injury to any legally protected interest. Because the funding cut did not abridge Olson's constitutional

**3.** Olson offered several reasons why the *Fuse* was a poor substitute for the *News*. She stated that an average issue of the *Fuse* contained 90% less content than an issue of the *News*. Further, according to Olson, newspaper design and magazine design are discrete skills. She expressed the view that newspaper design skills are far more important to students planning a career in journalism.

**4.** The State Board for Community Colleges and Occupational Education was named as a defendant because, as alleged in the complaint, it had "authority and control over the funds of Pikes Peak Community College, including student activity funds." The other defendants—the Pikes Peak Community College Council, members of the student senate, the college's president, vice-

president, and activities director—were joined in the complaint for the same reason. Because the educational officials responsible for the administration of Pikes Peak Community College approved the student senate's decision to terminate funding for the *News*, the plaintiffs' complaint satisfied the requirement of 42 U.S.C. § 1983 that some person act under color of state law in depriving another of their civil rights.

**5.** The position of the defendants on this appeal, as argued in their brief, is not that Olson failed to assert third party standing on behalf of students but, rather, that she simply has failed to demonstrate a sufficient threat to the First Amendment rights of students as to justify her assertion of those students' First Amendment interests.

rights, the court also ruled that she was not entitled to assert the First Amendment rights of students at Pikes Peak Community College. The district court further ruled that two of the student plaintiffs, Marti Dyer-Allison and Marie Moon, lacked standing because, having graduated in June of 1979, their First Amendment rights could not have been curtailed by the student senate action, which related solely to the 1979–80 academic year. With respect to the third student plaintiff, Vicki Evans, who did attend Pikes Peak Community College during the 1979–80 academic year, the court ruled that she lacked standing because she suffered no injury in fact, having exercised her First Amendment rights through the "substitute forum" of the *Fuse.*

Olson appealed, but the student plaintiffs did not. The court of appeals reversed the summary judgment against Olson and remanded the case for further proceedings. It held that Olson had standing to challenge the funding cut by reason of an injury in fact to two legally protected interests: (1) her constitutional right to utilize the student newspaper as a chosen teaching method for instruction in newspaper design; and (2) her constitutionally protected "acts of assistance and association with the publication" of the newspaper. *Olson,* 652 P.2d at 1091. Having resolved this aspect of Olson's appeal in her favor, the court of appeals determined that it "need not reach the question of whether she can assert the rights of her students." *Id.* We hold that the funding cut implicated no constitutionally protected interest of Olson, but that she should be permitted to assert the First Amendment rights of the nonparty students at Pikes Peak Community College. We therefore reverse the judgment of the court of appeals and remand for further proceedings on that aspect of Olson's claim relating to the First Amendment rights of the students.

## II.

■ Our analysis must necessarily begin with an overview of the basic principles of standing relevant to Olson's challenge to the governmental action in this case. In essence, the question of standing is really an inquiry into "whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin,* 422 U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). The proper resolution of this question involves two considerations: (1) whether the plaintiff has suffered actual injury from the challenged governmental action; and (2) whether the injury is to a legally protected or cognizable interest. *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977); *accord, e.g., Marco Lounge, Inc. v. City of Federal Heights,* 625 P.2d 982 (Colo.1981); *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission,* 620 P.2d 1051 (Colo. 1980); *Denver Urban Renewal Authority v. Byrne,* 618 P.2d 1374 (Colo.1980); *Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979). The purpose served by this two-pronged test of standing was set forth in *Conrad v. City and County of Denver,* 656 P.2d 662, 668 (Colo.1983):

"The 'injury-in-fact' requirement is dictated by the need to assure that an actual controversy exists so that the matter is a proper one for judicial resolution, for consistent with the separation of powers doctrine embodied in Article III of the Colorado Constitution, '[c]ourts cannot, under the pretense of an actual case, assume powers vested in either the executive or the legislative branches of government.' [quoting *Wimberly,* 194 Colo. at 167, 570 P.2d at 538]. The requirement that the interest injured be of a type legally protected by statutory or constitutional provisions is a prudential rule of standing based on judicial self-restraint."

■ In determining whether standing has been established, all averments of material fact in a complaint must be accepted as true. *Board of County Commissioners v. City of Thornton,* 629 P.2d 605 (Colo. 1981). Also, it is within the discretion of the court to permit the plaintiff, by affida-

vit or other competent evidence, to supply further particularized allegations of fact supportive of standing. *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206. If the complaint, along with any other evidence submitted to the court, fails to establish any actual harm to the plaintiff, then the case must be dismissed. *Id.* at 501–02, 95 S.Ct. at 2206–2207.

■ When the plaintiff does establish an actual injury in fact, the court must then determine whether this injury is to a legal interest which entitles the plaintiff to judicial redress. *Warth,* 422 U.S. at 500, 95 S.Ct. at 2206; *Conrad,* 656 P.2d at 668. Resolution of this second prong of standing basically rests on a normative judgment that the injury is or is not actionable. The court must determine whether the particular constitutional or statutory provision underlying the claim creates a right or interest in the plaintiff that has been arguably abridged by the challenged governmental action. *See, e.g., Warth,* 422 U.S. at 499–500, 95 S.Ct. at 2205–2206; *Conrad,* 656 P.2d at 668; *Dodge,* 198 Colo. at 382–83, 600 P.2d at 71–72; *see also* Albert, *Justiciability and Theories of Judicial Review: A Remote Relationship,* 5 S.Cal.L.Rev. 1139, 1144–54 (1977). A determination that standing exists thus amounts to a holding that the plaintiff has stated a claim for relief by demonstrating the existence of a legal right or interest which has been arguably violated by the action of the defendant. Such determination, of course, is not equivalent to a resolution of the merits of the controversy. *E.g., Conrad,* 656 P.2d at 668; *Cloverleaf Kennel Club,* 620 P.2d at 1056; *Wimberly,* 194 Colo. at 168, 570 P.2d at 539. An adjudication on the merits will often involve both disputed issues of fact and mixed questions of law and fact not resolved by the court's ruling on standing. A determination that standing does not exist is equivalent to a holding that the plaintiff has failed to state a claim upon which relief can be granted, because whatever injury the plaintiff might have sustained was not an injury to a legally protected right or interest. *E.g., Warth,* 422 U.S. at 500–01, 95 S.Ct. at 2205–2206; *Cloverleaf Kennel Club,* 620 P.2d at 1056–57.

■ Although as a general rule a plaintiff must assert an infringement to her own legal interest in challenging the constitutionality of governmental action, *e.g., Warth,* 422 U.S. at 499–501, 95 S.Ct. at 2205–2206; *DiLeo v. Board of Regents,* 196 Colo. 216, 220–21, 590 P.2d 486, 489 (1978), *cert. denied,* 441 U.S. 927, 99 S.Ct. 2042, 60 L.Ed.2d 402 (1979); *American Metal Climax, Inc. v. Butler,* 188 Colo. 116, 119–20, 532 P.2d 951, 953 (1975), a plaintiff who demonstrates an actual injury sufficient to guarantee concrete adverseness may be permitted to assert the rights of third parties not before the court when at least one of the following factors is present: the presence of a substantial relationship between the plaintiff and the third party; the difficulty or improbability of these third parties in asserting an alleged deprivation of their own rights; or the existence of some need to avoid dilution of third party rights in the event standing is not permitted. *See, e.g., Carey v. Population Services International,* 431 U.S. 678, 683–84, 97 S.Ct. 2010, 2015–2016, 52 L.Ed.2d 675 (1977); *Craig v. Boren,* 429 U.S. 190, 193–97, 97 S.Ct. 451, 454–456 (1976); *Augustin v. Barnes,* 626 P.2d 625, 628 (Colo.1981).

In the context of First Amendment claims, prudential limitations on third party standing have been even more relaxed. For example, in *Secretary of State of Maryland v. Joseph H. Munson Co.,* — U.S. ——, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984), a professional fund raiser was permitted to challenge the constitutional validity of a state statute on behalf of its customers and other charitable organizations. The statute prohibited a charitable organization, in connection with fund raising activity, from paying or agreeing to pay as expenses more than twenty-five percent of the amount raised. In according the professional fund raiser third party standing to challenge the statute, the United States Supreme Court stated:

"Where practical obstacles prevent a party from asserting rights on behalf of

itself, for example, the Court has recognized the doctrine of *jus tertii* standing. In such a situation, the Court considers whether the third party has sufficient injury-in-fact to satisfy the Article III case or controversy requirement, and whether, as a prudential matter, the third party can reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal. See *e.g., Craig v. Boren,* 429 U.S. 190, 193–194 [97 S.Ct. 451, 454–455, 50 L.Ed.2d 397] (1976).

"Within the context of the First Amendment, the Court has enunciated other concerns that justify a lessening of prudential limitations on standing. Even where a First Amendment challenge could be brought by one actually engaged in protected activity, there is a possibility that, rather than risk punishment for his conduct in challenging the statute, he will refrain from engaging further in the protected activity. Society as a whole then would be the loser. Thus, when there is danger of chilling free speech, the concern that constitutional adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged. 'Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.' *Broadrick v. Oklahoma,* 413 U.S. 601, 612 [93 S.Ct. 2908, 2916, 37 L.Ed.2d 830] (1973)." 104 S.Ct. at 2847.

*See also Schaumberg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980) ("Given a case or controversy, a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court."); *Eisenstadt v. Baird,* 405 U.S. 438, 445 n. 5, 92 S.Ct. 1029, 1034 n. 5, 31 L.Ed.2d 349 (1972) ("Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech.").

### III.

In considering the application of these general principles of standing to Olson's claim for relief, we accept as true Olson's assertion of injury in fact—namely, that the student senate's funding decision deprived her of the opportunity to use the *News* as an instructional device for newspaper design and layout and, in addition, eliminated the opportunity to associate with the newspaper staff in her role as faculty advisor. We also point out that this case does not involve the question of penalizing a teacher in a state school for exercising constitutional rights. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Bertot v. School District No. 1,* 522 F.2d 1171 (10th Cir.1975); *Durango School District No. 9–R v. Thorpe,* 200 Colo. 268, 614 P.2d 880 (1980). Olson makes no claim that the funding decision was made in retaliation for the exercise of her constitutional rights. Her position as teacher was never in jeopardy, nor has she been prohibited or discouraged from acting as faculty advisor to the *Fuse* or to any other student publication. With these preliminary matters aside, we turn to whether Olson's asserted injury in fact was to her own legally protected interests so as to state a claim for relief.

### A.

In sustaining Olson's complaint, the court of appeals reasoned that the funding cutoff abridged Olson's constitutional right to teach protected by the First Amendment to the United States Constitution. We reach a contrary result.

Although the United States Constitution is silent on the right to teach, the specific reference in the First Amendment to the

freedoms of speech and the press is designed to assure "the free exchange in the general marketplace of ideas." *Cary v. Board of Education of Adams-Arapahoe School District,* 427 F.Supp. 945, 949 (D.Colo.1977), *aff'd,* 598 F.2d 535 (10th Cir. 1979). Viewed in light of the scope and purpose of the First Amendment, the freedom of expression guaranteed therein is inseparably linked to the principle of academic freedom. This principle finds its source in the belief that teachers should be free to engage in the exchange of diverse ideas on controversial topics, both within and outside the classroom, without risking the imposition of sanctions as a result of their ideological expressions. *See* Note, *Academic Freedom in the Public Schools: The Right to Teach,* 48 N.Y.U.L.Rev. 1176, 1180–82 (1973); *Developments in the Law—Academic Freedom,* 81 Harv.L.Rev. 1045, 1048 (1968). As the United States Supreme Court remarked in *Keyishian v. Board of Regents,* 385 U.S. 589, 603, 87 S.Ct. 675, 683, 17 L.Ed.2d 629 (1967):

> "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. 'The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' *Shelton v. Tucker,* [364 U.S. 479, 487, 81 S.Ct. 247, 251, 5 L.Ed.2d 231 (1960)]. The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.' *United States v. Associated Press,* 52 F.Supp. 362, 372 [ (S.D.N.Y.1943) ]."

■ Various courts, in the wake of *Keyishian,* have recognized that a teacher in a public educational institution has a constitutionally protected First Amendment interest in choosing a particular pedagogical method for presenting the idea-content of a course, as long as the course is part of the official curriculum of the educational institution and the teaching method serves a demonstrable educational purpose. *See, e.g., Kingsville Independent School District v. Cooper,* 611 F.2d 1109 (5th Cir. 1980) (school district constitutionally prohibited from refusing to renew high school history teacher's contract because she engaged students in racial role-playing during history class); *Keefe v. Geanakos,* 418 F.2d 359 (1st Cir.1969) (injunctive relief granted to prevent discharge of tenured high school English teacher for assigning an article containing vulgar term and for discussing that term in class); *Sterzing v. Fort Bend Independent School District,* 376 F.Supp. 657 (S.D.Tex.1972) (dismissal of high school civics teacher for classroom discussion of controversial subjects violated First Amendment where teaching method served a demonstrated educational purpose); *Webb v. Lake Mills Community School District,* 344 F.Supp. 791 (N.D. Iowa 1972) (constitutionally impermissible under First Amendment to discharge high school drama coach in reprisal for use of vulgar term and drinking scenes in play rehearsals when term and scenes had some relevancy to proper teaching of drama and teacher had not previously been advised that such use prohibited); *Parducci v. Rutland,* 316 F.Supp. 352 (M.D.Ala.1970) (dismissal of high school teacher for assigning short story containing references to vulgar terms and to an involuntary sex act constituted an abridgement of teacher's First Amendment right to academic freedom). These decisions, we believe, proceed from an interpretation of the First Amendment that is consistent with the principle of academic freedom espoused in *Keyishian.*[6]

6. One commentator, in recognition of the state's authority to exercise control over its academic institutions, has rejected a constitutional "right to teach." Goldstein, *The Asserted Constitution-* *al Right of Public School Teachers to Determine What They Teach,* 124 U.Pa.L.Rev. 1293 (1976). "Professionalism is rejected as a basis for such a right because, *inter alia,* teachers are not inde-

To recognize a teacher's First Amendment interest in pedagogical method is not to say, however, that governmental officials responsible for the administration of an educational institution may not exercise broad discretion in the selection of curriculum courses and in the funding of cocurricular and extra-curricular activities. The administration of a school, at whatever level in the educational continuum, involves a constant process of selection and winnowing based not only on educational needs but on financial realities as well. *See Seyfried v. Walton*, 668 F.2d 214, 217 (3d Cir.1981); *President's Council, District 25 v. Community School Board No. 25*, 457 F.2d 289, 293 (2d Cir.1972). Those officials responsible for directing an educational program must be allowed to decide how the limited resources of an institution can best be used to achieve the goals of educating students. *See Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). Since the objective of the educational process is the inculcation of both knowledge and social values in the student, decisions as to what subjects will be taught and what resources will be available to the teacher will necessarily involve an acceptance or rejection of some values over others.[7] Such decisions, of course, must always be made "in a manner that comports with the transcendent imperatives of the First Amendment." *Board of Education v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982) (plurality opinion).

We are satisfied that Olson's claim on her own behalf, as alleged in her complaint and as supplemented in her deposition testimony, does not demonstrate any injury to her First Amendment right to teach. Her claim basically centers on an alleged entitlement to use a student newspaper as an instructional device in imparting to participating members of the newspaper staff practical skills in newspaper design and layout and in advising them on matters of financing, obscenity, and libel. The publication of the *News*, however, was not a part of the official curriculum at Pikes Peak Community College. Although characterized by Olson as a cocurricular activity, the *News* was nonetheless a student activity funded by the student senate and ancillary to the formal educational process at Pikes Peak Community College. While the decision to terminate funding of the *News* might arguably have implicated the First Amendment expression rights of students, *see, e.g., Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); *Joyner v. Whiting*, 477 F.2d 456 (4th Cir.1973), it did not abridge the constitutionally protected aspect of Olson's teaching function. Whether the newspaper is published or not, Olson's freedom to choose an appropriate method for classroom presentation of the idea-content of her journalism courses remains unfettered,

---

pendent contractors but are part of a conventional employer-employee relationship." *Id.* at 1356. Notwithstanding the existence of an employer-employee relationship, we believe this notion runs counter to the concept of academic freedom articulated in *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), insofar as it might deny a teacher any right of choice with respect to pedagogical method in presenting the subject matter of a course. Educational officials, of course, may still discharge a teacher for reasons unrelated to the interest of the teacher in academic freedom, such as incompetency or failure to obey legitimate administrative directives regarding classroom order and discipline. *E.g., Adams v. Campbell County School District*, 511 F.2d 1242 (10th Cir.1975); *Ahern v. Board of Education of the School District of Grand Island*, 456 F.2d 399 (8th Cir.1972).

7. Undoubtedly, a governmental interest in limiting discretion of teachers in course content and methodology grows stronger as the age of the student decreases. *E.g., Webb v. Lake Mills Community School District*, 344 F.Supp. 791 (N.D.Iowa 1972). This is simply a recognition of the fact that in primary and secondary schools the principle of academic freedom must be balanced by the countervailing interest of the state in inculcating basic community values in students who may not be mature enough to deal with the educational process as understood and practiced at higher educational levels. *See Mercer v. Michigan State Board of Education*, 379 F.Supp. 580 (E.D.Mich.), *aff'd mem.*, 419 U.S. 1081, 95 S.Ct. 673, 42 L.Ed.2d 678 (1974).

as does her ability to select those ideas and principles that she believes will enrich the educational experience of her students.

Although the full range of the constitutional right to teach is far from settled, we see no basis under existing First Amendment jurisprudence to vest a teacher with an affirmative right to require an educational institution to allocate funds for a particular student activity in order to enhance the pedagogical goals of the teacher, however commendable those goals may be, when the student activity is not part of the official curriculum of the institution, is managed by the students themselves, and the teacher's relationship to the activity is advisory only. We therefore hold that under the circumstances of this case Olson's right to teach did not encompass a constitutionally protected interest in the publication of the *News* as an instructional instrument.

**B.**

Turning now to the second ground relied on by the court of appeals in sustaining Olson's complaint—the freedom of association—we conclude that Olson's claim did not implicate any associational interest protected by the First Amendment.

■■■ Freedom of association is considered to be an element of the broad right to freedom of expression and protects "the right of individuals to associate to further their personal beliefs." *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972); *see also Griswold v. Connecticut*, 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). "Association," in the context of First Amendment doctrine, refers to the medium through which individual members of a group seek to make more effective the expression of their own views. *See NAACP v. Alabama*

*ex rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). The right to associate thus recognizes one's right to join with others to pursue goals independently protected by the First Amendment, such as literary expression, political change, or religious worship.[8] L. Tribe, *American Constitutional Law* 702–03 (1978). An abridgement of that right occurs when any insufficiently justified governmental action interferes with or discourages a group's pursuit of these First Amendment interests. *Id.* at 703.

■■■ Any injury sustained by Olson as a result of the funding cutoff was not an abridgement of her First Amendment right to freedom of association. Olson, as faculty advisor to the *News*, had no right to censor the student newspaper, nor to require the paper to publish her own views. *See Reineke v. Cobb County School District*, 484 F.Supp. 1252 (N.D.Ga.1980). To the extent that there might be a constitutional right of association incident to the publication of the *News*, any such constitutional right would belong to the students and not to Olson in her role as faculty advisor. Nor has Olson demonstrated that her association with the *News* staff was the medium for her exercise of any other constitutional right independently protected by the First Amendment. Olson's claim amounts to no more than an assertion of a personal interest, admittedly important to her, in associating as faculty advisor with members of the *News* staff. This personal interest, standing alone, does not rise to the level of a constitutional right to require the continuation of the *News* as the medium through which her interest might be maintained.[9] Olson has simply failed to establish that any First Amendment right

**8.** It has been observed that in a society which regards the individual as the ultimate concern of the social order, "it would hardly seem possible that an abstract entity such as an association should enjoy rights apart from and indeed greater than its individual members." Raggi, *An Independent Right to Freedom of Association*, 12 Harv.C.R.–C.L.L.Rev. 1, 15 (1977). To hold otherwise "would contradict the equality of oppor-

tunity which is at the heart of this argument for freedom of association." *Id.* at 15–16.

**9.** Moreover, Olson continues to enjoy the unimpaired freedom to associate as faculty advisor with students who published the *Fuse*, which replaced the *News*, and, for that matter, with students engaged in any other publication efforts.

belonging to her was somehow abridged by the funding cutoff.

## C.

Although not addressed by the court of appeals, Olson also argues that, even in the absence of demonstrating any violation of her own constitutional rights, she nonetheless should be accorded standing to challenge the student senate funding decision as it affected the First Amendment rights of students at Pikes Peak Community College. We find merit in her argument.

 As noted previously, Olson has asserted and demonstrated that the funding cutoff deprived her of the opportunity to use the *News* as an instructional device and to associate with the newspaper staff in her role as faculty advisor. Although these privations are not legally congnizable in the sense of abridging Olson's First Amendment teaching and associational interests, Olson nonetheless has demonstrated concrete adverseness *vis-a-vis* the defendants sufficient to assure the effective presentation of the issues underlying the First Amendment interests of the students. The students' exercise of their First Amendment rights is inextricably bound up with the activity that Olson seeks to prohibit, namely, the funding cutoff for the *News*. While we are dealing here with an administrative decision rather than an overbreadth challenge to a state statute, as in *Secretary of State v. Joseph H. Munson Co.,* —— U.S. ——, 104 S.Ct. 2839, 81 L.Ed.2d 786, the effect of the administrative decision on the First Amendment rights of the students is at best only a difference in degree from the prohibitory effect of a statute. Olson has sufficiently demonstrated, at least for the purpose of third party standing, that the administrative decision to terminate funding of the *News* has a chilling effect on the free speech rights of the students and their related associational activity in exercising those rights through the medium of a student publication funded in whole or in part by the college. Under these circumstances, we believe that Olson should be accorded third party standing to challenge the funding decision on behalf of the students.

In addition to the significant First Amendment interests of the students at issue here, there are several prudential considerations which warrant granting third party standing to Olson. Olson's role as faculty advisor to the *News* gave rise to a substantial relationship between herself and the student members of the *News* staff. This relationship renders Olson as effective a proponent of the First Amendment rights of students as the students themselves. *See Singleton v. Wulff,* 428 U.S. 106, 115, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976) (plurality opinion); *Eisenstadt,* 405 U.S. at 445, 92 S.Ct. at 1034; *Augustin,* 626 P.2d at 628–29. Furthermore, there are real obstacles that confront students interested in asserting constitutional deprivations as a result of the funding cutoff. Pikes Peak Community College is a two-year educational institution, and students have but brief tenure in which to initiate and bring to a conclusion a lawsuit challenging the funding cutoff. As demonstrated by the district court's entry of summary judgment against two of the student plaintiffs, graduation poses the risk of mootness. Although this obstacle is not insurmountable, in that matriculating students could be substituted as party plaintiffs, there is little lost in terms of effective advocacy by allowing Olson as teacher and faculty advisor to assert the rights of the students. *See Singleton,* 428 U.S. at 117–18; *Augustin,* 626 P.2d at 629. Finally, we cannot ignore the risk of diluting the constitutional interests of students in the event third party standing is not permitted. Enforcement of the funding cutoff could have a material effect on the ability of third party students to exercise their speech and associational rights through the medium of the student newspaper. Providing a judicial forum for the vindication of these constitutional interests prevents their dilution through student sufferance. *See Eisenstadt,* 405 U.S. at 445–46, 92 S.Ct. at 1034–1035; *Augustin,* 626 P.2d at 629.

We reverse the judgment of the court of appeals insofar as it holds that the funding cutoff abridged Olson's First Amendment teaching and associational interests. With respect to Olson's standing to assert the First Amendment rights of nonparty students, an issue not addressed by the court of appeals, we reverse the district court's entry of summary judgment for the defendant and remand the case to the court of appeals with directions to return the case to the district court for further proceedings on this aspect of Olson's claim.

ROVIRA, J., concurs in part and dissents in part and ERICKSON, C.J., joins in the concurrence and dissent. LOHR, J., concurs in part and dissents in part. KIRSHBAUM, J., does not participate.

ROVIRA, Justice, concurring in part and dissenting in part.

I concur in the majority opinion except as to part II C, which holds that Olson has standing to challenge the student senate funding decision as it affected the first amendment rights of students at Pikes Peak Community College.

The majority opinion holds that even though Olson's first amendment or associational rights were not violated she has demonstrated that the decision to terminate funding of the school newspaper has a chilling effect on the free speech rights of students and, therefore, she is entitled to assert their first amendment claims. In support of this conclusion, it notes that Olson has demonstrated "concrete adverseness" sufficient to assure effective presentation of the students' first amendment rights. It then sets out three prudential considerations which warrant giving Olson third party standing: (1) substantial relationship between Olson and the students; (2) obstacles that confront students in asserting their own rights; and (3) possible dilution of student first amendment interests if third party standing is not permitted.

In my view, there were no obstacles which prevented student members of the News staff from asserting their own first amendment rights. Three students were named plaintiffs when the complaint was filed. Even though two of them graduated, the third student continued in school. None of the students appealed the decision of the trial court. Other students could have been substituted as party plaintiffs. If students at the college are concerned about their first amendment rights, they have every right to seek redress in the courts. Under the facts of this case, I do not believe that there would be a dilution of the students' constitutional rights if third party standing was not permitted. The three "prudential" considerations set out in the majority opinion have not been sufficiently established to warrant granting Olson third party standing to claim the first amendment rights of students.

I am authorized to say that ERICKSON, C.J., joins me in the concurrence and dissent.

LOHR, Justice, concurring in part and dissenting in part.

The majority concludes that respondent Judith Olson, a teacher at Pikes Peak Community College, has not demonstrated that her First Amendment right of academic freedom encompasses the use of the student newspaper, the *Pikes Peak News (News)*, as an instructional device. The court holds, therefore, that Olson has no standing to complain of termination of funding for that newspaper. I respectfully dissent from that holding, based on my disagreement with the application of the law as set forth in the court's opinion to the facts of this case. I concur, however, in part II C of the majority opinion, which holds that Olson should be accorded standing to challenge the funding decision as it affected the First Amendment rights of students at Pikes Peak Community College.

In her deposition, Olson described the relationship between the *News* and the journalism classes that she taught at Pikes Peak Community College. She characterized the *News* as a "motivational device" for beginning, intermediate and advanced

classes in newspaper design. The publication of the *News* was a co-curricular activity, i.e., one that "runs along with classes." Olson deposition at p. 4. Stories written as assignments in Olson's journalism reporting classes were submitted to those members of the *News* editorial staff who were also in Olson's classes, for in-class editing and submission to the full editorial staff of the *News*. Frequently these stories were printed in the *News*.[1] Design class students worked during class on layout and makeup for the *News*, and most of the time *News* editorial staff accepted the class product without change. Olson also taught a libel law course for journalism students, and as faculty advisor for the *News* she reviewed the stories to be published to assure that libel and obscenity were avoided.[2]

When the funding for the *News* was terminated, it was necessary to cease teaching newspaper design classes because, without practical application for the students' skills, instruction in newspaper design is greatly handicapped.[2] In place of newspaper design, Olson taught magazine design, a subject for which the *Pikes Peak Fuse* is a suitable vehicle. Olson testified, however, that knowledge of newspaper design is far more important to a journalism student than an understanding of magazine layout.

The majority acknowledges that the First Amendment protection of academic freedom encompasses the interests of a teacher in a public educational institution in choosing a particular pedagogical method for presenting the idea content of a course where the teaching method serves a demonstrable educational purpose. *See Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); *Webb v. Lake Mills Community School District*, 344 F.Supp. 791 (N.D.Iowa 1972); *Parducci v. Rutland*, 316 F.Supp. 352 (M.D.Ala. 1970). The majority limits this right, however, to courses that are part of the official curriculum of the educational institution and characterizes the production and publication of the *News* as a student activity that is "not a part of the official curriculum at Pikes Peak Community College." Slip op. at 18. In the context of this case, I think limitation of teaching method protection to exclude utilization of the *News* as a pedagogical method fails to give full scope to rights guaranteed by the First Amendment. The record shows that the *News* was financed by mandatory student fees allocated by the student senate and set forth in a budget approved by petitioner Pikes Peak Community College Council. Olson's testimony established that publication of the newspaper was a critically important tool for teaching newspaper layout and that the process of preparation of the *News* had its inception and significant development in her classrooms. Moreover, Olson stated that instruction in newspaper format skills and in the importance of free expression cannot be separated.[3] Under these circumstances, I would hold that Olson has made a showing of a legally protected First Amendment interest sufficient

---

**1.** The *News* also printed student stories that did not have their inception in journalism classes.

**2.** Olson testified, "It would be a disservice for a student to sign up for a course in newspaper design and not be able to assimilate the skills required for newspaper design and that is preventing me from performing academically in a credible fashion."

**3.** Olson testified as follows at her deposition:
Q Do you believe your First Amendment rights have been harmed, impaired somehow, chilled by the action of the Student Senate in cutting off the budget to the newspaper?
A Well, as a professional in journalism who must set an example or be a proponent for First Amendment rights, certainly this is the case because if your students are not allowed to have the experience of successfully incorporating their skills development with practical experience simply because of the disagreement of content, that certainly speaks to the First Amendment. Certainly if your content is looked at, say, you know, they won't fund it because of a content situation, that certainly is what the First Amendment is all about.
Q Well, specifically as opposed to the students, what First Amendment rights of yours—
A I don't think I can separate myself and what was done from the students because the program and the publication was an integral part, interrelated, in other words. I don't think they are two separate things.

to establish standing when tested by a motion for summary judgment.

I would affirm the judgment of the court of appeals and remand the case to that court with directions to return the matter to the district court for further proceedings on Olson's claim of violation of her First Amendment rights as well as for further proceedings in Olson's complaint that the funding cutoff violated the First Amendment rights of the students.

