Andrew ANDERSON and Industrial
Claim Appeals Office of the State
of Colorado, Petitioners,

v.

LONGMONT TOYOTA, INC.; HIH
Insurance; and Western Guaranty
Fund Services, Respondents.

Timothy Krause and Industrial Claim
Appeals Office of the State of
Colorado, Petitioners,

v.

Sorter Construction, Inc.; and Pinnacol
Assurance, Respondents.

Nos. 03SC450, 04SC22.

Supreme Court of Colorado,
En Banc.

Dec. 6, 2004.

Jean E. Dubofsky, P.C., Jean E. Dubofsky, Boulder, Pepe J. Mendez & Associates, P.C., Pepe J. Mendez, Denver, for Petitioner Andrew Anderson.

Ken Salazar, Attorney General, Laurie Rottersman, Assistant Attorney General, State Services Section, Denver, for Petitioner Industrial Claim Appeals Office.

Clifton, Hook & Bovarnick, P.C., Richard A. Bovarnick, Harvey D. Flewelling, Denver, for Respondents Longmont Toyota, Inc.; HIH Insurance; and Western Guaranty Fund Services.

Clisham, Satriana & Biscan, L.L.C., Patricia Jean Clisham, Keith E. Mottram, Denver, for Amicus Curiae Colorado Self Insurers Association.

Pinnacol Assurance, Brandee DeFalco Galvin, Michael J. Steiner, Denver, for Amicus Curiae Pinnacol Assurance.

Eley & Eley, LLC, Craig C. Eley, Douglas R. Phillips, P.C., Douglas R. Phillips, O'Toole & Sbarbaro, PC, Neil D. O'Toole, Denver, for Amicus Curiae Worker's Compensation Education Association.

Withers Seidman Rice & Mueller, P.C., Christopher Seidman, Grand Junction, for Petitioner Timothy Krause.

HOBBS, Justice.

In these workers' compensation cases, we address two certiorari issues involving temporary total disability (TTD) benefit provisions in section 8–42–105(4) of the Workers' Compensation Act of Colorado, sections 8–40–101 to 8–47–209, C.R.S. (2004)("Act").[1] At issue are competing constructions of this section by the Industrial Claim Appeals Office (ICAO) and the Colorado Court of Appeals.

The statute recites that, "[i]n cases where it is determined that a temporarily disabled employee is *responsible* for termination of employment, *the resulting wage loss* shall not be attributable to the on-the-job injury." § 8–42–105(4), C.R.S. (2004)(emphasis added).

This provision applies to employee TTD claims made after an injured worker returns to modified employment and subsequently quits the employment or is fired for cause.[2]

The ICAO construed section 8–42–105(4) as barring TTD wage loss claims when the voluntary or for-cause termination of the modified employment causes the wage loss, but not when the worsening of a prior work-related injury causes the wage loss.

The court of appeals construed this provision as an absolute bar to all subsequent TTD claims involving the employer and the employee. Accordingly, it ordered denial of the worsening condition TTD benefits to the employees in the two cases before us, *Longmont Toyota v. Indus. Claim Appeals Office*, 85 P.3d 548 (Colo.App.2003) ("*Longmont Toyota*") and *Sorter Constr. Inc. v. Indus. Claim Appeals Office*, No. 03CA0279, slip op., 2003 WL 22967373 (Colo.App., Dec. 18, 2003) (not selected for official publication) ("*Sorter Construction*").

We agree with the ICAO and reverse the judgments of the court of appeals. We hold that section 8–42–105(4) bars TTD wage loss claims when the voluntary or for-cause termination of the modified employment causes the wage loss, but not when the worsening of a prior work-related injury causes the wage loss.

### I.

#### A. *Longmont Toyota*

*Longmont Toyota* involves a workers' compensation claim for a worsened condition that arose subsequent to claimant's voluntary resignation from the injury-related employment. Claimant, Andrew Anderson, sustained a low-back injury on June 5, 2000 while employed as a mechanic at Longmont Toyota, Inc. He was restricted from work by his authorized physician and returned to modified light duty at Longmont Toyota with full salary on July 26, 2000. Shortly afterwards, Anderson had a dispute with his employer and voluntarily resigned.

One week later, Anderson obtained employment with Century Chevrolet under the same restrictions to which he was subject at Longmont Toyota. He performed his duties until September 13, 2000 when his condition worsened. Anderson saw an authorized physician who increased his physical restrictions to "seated position only with no bending, twisting or lifting activities." Because a mechanic cannot perform his job in this manner, Anderson could no longer continue his job at Century Chevrolet. He resigned and sought temporary total disability benefits from Longmont Toyota commencing September 13, 2000. Although the doctor concluded Anderson would not have been able to work at modified employment had he still been at Longmont Toyota, Longmont Toyota refused

---

**1.** The issue presented by Petitioners Anderson and ICAO is:

Whether the court of appeals erred when it construed section 8–42–105(4) as permanently barring claimants who are responsible for their separation from employment from receipt of temporary disability benefits when their conditions attributable to work-related injuries worsen.

The issue presented by Petitioners Krause and ICAO is:

Whether a temporarily totally disabled employee medically incapable of earning any wages from any employer is disqualified from receiving temporary total disability benefits by operation of sections 8–42–105(4) and 8–42–103(1)(g), 3 C.R.S.2003.

**2.** The identical provision also appears in section 8–42–103(1)(g) dealing with disability indemnity; our analysis of the General Assembly's intent applies to this section as well.

to pay for TTD benefits or medical treatment.

Following an evidentiary hearing, the Administrative Law Judge (ALJ) determined that Anderson was responsible for terminating his Longmont Toyota employment; his worsened condition was due to the natural progression of his industrial injury incurred at Longmont Toyota; and there was no intervening cause of the back pain. Despite the relationship between the back pain and the original injury, the ALJ ruled that Anderson's resignation from Longmont Toyota was a volitional act that severed the causal relationship between his wage loss and the work injury. The ALJ found section 82–42–105(4) barred him from receiving TTD benefits for the worsening condition.

On review, the ICAO concluded that the ALJ had misconstrued section 8–42–105(4) as a permanent bar to all temporary disability benefits where the claimant is determined to be "responsible" for the loss of employment. Determining that Anderson's wage loss after September 13, 2000 resulted from his worsened condition, not his voluntary resignation from Longmont Toyota, the ICAO held that the petitioner could claim TTD benefits.

Longmont Toyota appealed the ICAO ruling to the court of appeals. The court of appeals held that " § 8–42–105(4) is to be construed as a permanent bar to receipt of temporary disability benefits when a claimant is responsible for his or her separation from employment and the separation is for causes within the employee's control, but unrelated to the industrial injury." *Longmont Toyota*, 85 P.3d at 551. Anderson and the ICAO then filed their certiorari petitions.

### B. *Sorter Construction*

*Sorter Construction* involves a workers' compensation claim for a worsened condition that arose after claimant's termination for cause. Timothy Krause was working for Sorter Construction when he sustained a work-related injury. The company offered him modified duties, which he performed until February 22, 2002 when he walked off the job following a heated argument with his supervisor. Sorter Construction terminated Krause later that day for failing to obey instructions. On March 27, 2002, Krause underwent surgery to treat the work-related injury. As a result of this surgery, he was medically restricted from returning to all work.

When Krause sought TTD benefits, Sorter Construction asserted that section 8–42–105(4) prevented Krause from receiving benefits because it had terminated him for cause. The ALJ and the ICAO reasoned that the wage loss did not result from the employee's termination of employment; rather, his worsened condition resulted from the prior industrial injury at Sorter Construction and the wage loss would have occurred whether or not Krause was responsible for terminating the employment.

Relying on *Longmont Toyota*, the court of appeals again ruled that section 8–42–105(4) is an absolute bar to any subsequent claim, including a worsening condition claim. As with *Longmont Toyota*, the court of appeals set aside the ICAO order and remanded the case for the ALJ's entry of a new order denying claimant TTD benefits. We granted the ICAO's and Krause's petitions for certiorari.

### II.

We hold that section 8–42–105(4) bars TTD wage loss claims when the voluntary or for-cause termination of the modified employment causes the wage loss, but not when the worsening of a prior work-related injury incurred during that employment causes the wage loss.

### A. Standard of Review and Statutory Construction

The proper construction of section 8–42–105 of the Act is a question of law we review de novo. In conducting our analysis, we give considerable weight to an agency's interpretation of its own enabling statute, but we are not bound by the agency's legal interpretations. *Colorado Dep't of Labor and Employment v. Esser*, 30 P.3d 189, 193 (Colo. 2001).

Our duty is to effectuate the intent and purpose of the General Assembly. *Weld*

*County School Dist. RE–12 v. Bymer*, 955 P.2d 550, 554 (Colo.1998). We apply the plain and ordinary meaning of the statute, if clear. *Davison v. Indus. Claim Appeals Office*, 84 P.3d 1023, 1029 (Colo.2004); *see also Vigil v. Franklin*, No. 03SC479, slip op. at 11–12, 103 P.3d 322 (Colo. Nov. 30, 2004). If the statutory provision is unclear, we look to a variety of sources of legislative intent, including the object the legislature sought to obtain by the enactment, the circumstances under which it was adopted, and the consequences of a particular construction. § 2–4–203(1), C.R.S. (2004); *Bymer*, 955 P.2d at 554.

■■■ In construing provisions of the Act, we read the statute as a whole and, if possible, construe its terms harmoniously, reconciling conflicts where necessary. *Esser*, 30 P.3d at 195. If the wording of the statutory provision is ambiguous, we examine the impacts of alternative constructions and presume that the General Assembly intended a just and reasonable result. *Bymer*, 955 P.2d at 554. We consider the Act's legislative policy declaration, *Mountain City Meat Co. v. Oqueda*, 919 P.2d 246, 252 (Colo.1996), and the legislative history accompanying the provision's enactment, *Bymer*, 955 P.2d at 554.

As a general principle, workers' compensation benefits are designed to prevent destitution of an injured worker. Arthur Larson, 1 *Larson's Workers' Compensation Law*, § 1.02 (2004). Colorado's Act is based on a mutual renunciation of common law rights and defenses by employers and employees alike; the General Assembly intends the "quick and efficient delivery of disability and medical benefits to injured workers at a reasonable cost to employers, without the necessity of any litigation...." § 8–40–102(1), C.R.S. (2004).

■■■ An essential component of the injured employee compensation design, TTD benefits exist to help offset lost wages when the employee cannot work due to the injury. § 8–42–105, C.R.S. (2004). An employee is eligible for TTD benefits if: (1) the injury or occupational disease causes disability; (2) the

injured employee leaves work as a result of the injury; and (3) the temporary disability is total and lasts more than three regular working days. §§ 8–42–103(1)(a),(b), 8–42–105(1), C.R.S. (2004); *PDM Molding, Inc. v. Stanberg*, 898 P.2d 542, 546 (Colo.1995).

The injured employee receives TTD benefits until one of the following events occurs: (1) claimant reaches maximum medical improvement; (2) claimant returns to regular or modified employment; (3) claimant is medically released to regular employment; or (4) claimant is medically released to modified employment and fails to begin such employment. § 8–42–105(3)(a)–(d), C.R.S. (2004). Thus, a goal of the TTD provisions is to return employees to work through the avenue of modified employment if available-subject to whatever medical restrictions are appropriate.

The General Assembly enacted section 8–42–105(4) to address situations where an injured worker returns to modified employment, then leaves that employment voluntarily or is terminated for cause and, as a result, suffers wage loss. The General Assembly adopted this provision in 1999.

Agreeing with the ICAO and the court of appeals that this provision is unclear and ambiguous, we proceed with our analysis.

## B. Section 8–42–105(4)

The ICAO focused on the phrase "resulting wage loss" in section 8–42–105(4): "[i]n cases where it is determined that a temporarily disabled employee is responsible for termination of employment, the *resulting* wage loss shall not be attributable to the on-the-job injury." *Anderson v. Longmont Toyota, Inc.*, W.C. 4–465–839 (ICAO, Feb. 13, 2001). Pointing out the phrase's semantic connection between the employee's termination and loss of wages caused thereby, it reasoned that the General Assembly did not intend to bar worsening condition TTD benefits; if so, it would have clearly stated that "no subsequent wage loss could be attributed to the on-the-job injury." *Id.*[3]

---

**3.** The ICAO reached a similar conclusion in a series of cases following *Anderson*, including: *Lovato v. Cathedral of the Sacred Heart*, W.C. 4–

463–726 (ICAO May 13, 2002); *Selvage v. Terrace Gardens*, W.C. 4–486–812 (ICAO September 23,

Overruling the ICAO by its alternative construction of the statute, the court of appeals cited the dictionary definition of "resulting" as meaning "something that results as a consequence, effect, issue, or conclusion." *Longmont Toyota*, 85 P.3d at 550 (quoting Webster's Third New International Dictionary 1937 (1969)). Reasoning that this definition "encompasses both direct and indirect consequences, and in this context, the word can plausibly be interpreted either narrowly to mean a wage loss that occurs immediately following a separation for cause, or broadly to mean any subsequent wage loss," the court found the word "resulting" in the statutory phrase to be ambiguous. *Id.*

The court of appeals concluded that the sponsoring legislators "expressed a clear intent to overrule *PDM Molding* and completely cut off temporary benefits whenever an injured worker is responsible for separation from the employment where the injury occurred, *regardless of the consequences that followed.*" *Id.* at 551 (emphasis added). It held that the termination statutes are "to be construed as a permanent bar to receipt of temporary disability benefits when a claimant is responsible for his or her separation from employment and the separation is for causes within the employee's control, but unrelated to the industrial injury." *Id.*

In addressing the legislature's intent, the court of appeals turned to *Monfort v. Husson*, 725 P.2d 67 (Colo.App.1986), and the introduction of employee fault for job termination in ascertaining eligibility for benefits. The issue in *Monfort* was whether an injured employee who "has not reached maximum medical improvement, and is terminated from the employment out of which the injury arose, is eligible to receive temporary partial disability benefits during subsequent periods of wage loss." 725 P.2d at 69. Under the facts of that case, the court of appeals enunciated a legal rule that "the issue of fault with reference to termination is the dispositive consideration." *Id.*

As it turned out, the claimant in *Monfort* proved that he was not terminated due to misconduct and that he had "difficulty obtaining even substandard employment which would accommodate his physical restrictions," *id.* at 70, so the court of appeals proceeded to hold in favor of the claimant. It concluded that the reduced wage at the subsequent employer was attributable to the industrial injury, and claimant was entitled to workers' compensation benefits for the period following termination. *Id.*

Nevertheless, the *Monfort* decision introduced the issue of fault for the termination as a basis for denying workers' compensation benefits. Taking apparent issue with the court of appeals fault analysis, we held in *PDM Molding* "that if a work related injury contributes to some degree to a claimant's loss of wages, the claimant is eligible for temporary total disability benefits pursuant to section 8–42–105." 898 P.2d at 548. As the legislative history to section 8–42–105(4) demonstrates, this statement caused concern among employers, their insurers, and members of the General Assembly that we had created a "loophole" promoting illegitimate claims.

We acknowledge that the 1999 legislative debate surrounding enactment of section 8–42–105(4) was concerned with the point that *PDM Molding* had opened the door to rewarding employees for causing workplace disruptions, or walking off the job, and then being compensated for wage loss in doing so. Nevertheless, contrary to the court of appeals conclusion that the General Assembly clearly intended an absolute bar to all subsequent TTD benefits involving that employer, the debate actually demonstrates the General Assembly's intent not to bar the employee's subsequent worsening condition claim.

Representative Berry, a sponsor, stated the bill's sole purpose was "to clarify that temporary total disability is for when you're off work and injured, and it's not for any other reason." Transcript of Hearings on House Bill 99–1105 before the House Business Affairs and Labor Committee, 62nd Gen. Assembly, 1st Sess. (Jan. 14, 1999 and Jan. 25, 1999) and the Senate State Affairs Committee, 62nd Gen. Assembly, 1st Sess. (Feb. 22, 1999 and Mar. 15, 1999) at 2 (state-

2002); *Taylor v. Backwood Video*, W.C. 4–501– 466 (ICAO January 16, 2003).

ment of Representative Berry) (hereinafter "Transcript of Hearings").[4]

Representative Berry then turned to testimony by supporters of the bill. They said it would remedy situations in which employees: (1) were fired from the modified employment because of inappropriate or unlawful behavior such as assaulting a supervisor, drinking on the job, or failing to report to work, or (2) left modified employment for other job opportunities or because they did not want to work. For example, supporters of the bill made the following statements:

> Typically, we see these cases in situations where an employee has returned to modified work, the employer is accommodating restrictions, and then the employee leaves for reasons that are very often the employee's own fault; not always, but almost always the employee's own fault.

> We've seen cases, for example, where an employee was discharged for drinking on the job and then went and received TTD or wage loss benefits from the ALJ, the Administrative Law Judge, and didn't even have to show a job search following her discharge.

> She simply went in, proved to the ALJ that she had restrictions—and, of course, everyone in this situation, doing modified work, has restrictions.... She was fired for drinking on the job. That was apparently irrelevant to the ALJ, and she was awarded benefits. This is the sort of problem we want to solve. We think this bill will solve it.

> It [*PDM Molding*] has been applied in similar cases where, for example, the employee was fired for assaulting a supervisor. It was applied in one case where the claimant was returned to modified work, and then a co-employee apparently tipped off the employer that the claimant was not authorized to work in this country, that he had falsified his work documents at his hiring.

> The employer looked into that and told the employee that he was temporarily suspended. He could return to the job if he brought work authorization, valid work au-

thorization. And he simply left, he never returned. And then showed up in the hearing room, made a claim for temporary total disability benefits, received those benefits, and once again, never had to show a job search following his discharge.

> We think these are the sort of cases that this will correct.

Transcript of Hearings at 22–23 (statement of Curt Kirsksium, Attorney, Colorado Compensation Insurance Authority).

> So what the bill does is to basically get back, I think, to the fundamentals of what the Workers' Comp system is meant to be and to say that you're entitled to temporary disability benefits if the only reason that you are unable to work is because of your on-the-job injury, not because of the fact that you want to retire or take a sabbatical or that you were, in fact, brought back to the job site and were fired for some other reason unrelated to your on-the-job injury.

Transcript of Hearings at 5–6 (statement of John Berry, Workers' Compensation Coalition).

Supporters of the bill emphasized the unfair burden placed on employers in such situations. First, employers absorb the cost of losing a productive worker to the injury. Second, employers assume the cost of developing "return to work" programs that allow the TTD employee to perform modified work while earning the pre-injury wage. Then the "costs of that TTD are added to the employer's premium ... so the employer ends up paying both the initial premium because of the TTD and the cost of a 'return to work program.'" Transcript of Hearings at 31 (statement of Curt Kirscium, Attorney, Colorado Compensation Insurance Authority).

Significantly, on the one occasion worsening condition claims came up during the debate, a supporter of the bill assured legislators that the bill left in place the process for identifying and compensating an employee's subsequent worsening condition claim following job termination:

---

4. This transcript of the recorded hearings was prepared by Burnham Court Reporting and is attached to Longmont Toyota's Answer Brief to this Court.

One other point that I don't think anyone has made is that if someone is terminated and their condition worsened, they can go back to the doctor. And maybe their restrictions are modified, and they would then be able to get temporary disability again. It's not going to be (inaudible) forever.

Transcript of Hearings at 37 (statement of Lynn Lyon, Colorado Compensation Insurance Authority).

I think it's important to keep in mind that it has to be approved by the doctor. So if they get worse or they just can't do the job that the employer offered, then there is recourse there. We're not just trying to cut people off cold without any benefits. This is for people who can actually, medically do some type of work.

Transcript of Hearings at 38 (statement of Lynn Lyon, Colorado (inaudible) Insurance Association).

This assurance that worsening condition compensation would not be jeopardized by passage of the bill occurred in the context of questions by legislators about the ramifications of passing the bill, and is particularly significant when paired with Representative Berry's statement, as sponsor, that the bill's purpose was "to clarify that temporary total disability is for when you're off work and injured, and it's not for any other purpose." Transcript of Hearings at 2.

■ Authority to reopen a workers' compensation award for a change of condition, including a worsening condition, is contained in section 8–43–303, C.R.S. (2004). *El Paso County Dep't of Social Servs. v. Donn*, 865 P.2d 877, 879 (Colo.App.1993). The intent of the reopening provision is to provide a remedy to employees who are entitled to additional award of benefits, whether medical or disability. *Cordova v. Indus. Claim Appeals Office*, 55 P.3d 186, 189 (Colo.App.2002).

■ Change of condition refers to a change in the condition of the original compensable injury or to a change in a claimant's physical or mental condition that can be causally connected to the original compensable injury. *Chavez v. Indus. Comm'n*, 714 P.2d 1328, 1330 (Colo.App.1985). A claimant

has the burden of proof in seeking to reopen a claim for a worsened condition. *Richards v. Indus. Claim Appeals Office*, 996 P.2d 756, 758 (Colo.App.2000).

■ The existence of this discretionary authority to reopen an award, within the prescribed statutory period, has long been a feature of Colorado's statutory design. *See Graden Coal Co. v. Yturralde*, 137 Colo. 527, 328 P.2d 105, 111 (1958). When the General Assembly chooses to legislate, it is presumed to be aware of its own enactments and existing case law precedent. *Vigil*, 103 P.3d at 327.

Had the General Assembly intended to modify the reopening provisions of section 8–43–303 when it adopted section 8–42–105(4), it would have expressed such an intent in the statutory language it chose to utilize, or the legislative history, or both. In neither do we find the legislature's intent to repeal or modify the ICAO's remedial authority to reopen workers' compensation awards, as it did in the two cases before us.

In summary, we conclude that the General Assembly intended section 8–42–105(4) to weed out wage loss claims subsequent to voluntary or for-cause termination of modified employment that do not involve a worsened condition.

### C. Application to this Case

■ In light of the General Assembly's 1999 debate and the remedial purposes of the Workers' Compensation Act, the ICAO correctly construed section 8–42–105(4) as not barring the worsening condition claims at issue in the two cases before us, even though one of the employees voluntarily left the modified employment and the other was fired for cause. The court of appeals construction of this statutory provision is contrary to the presumption that the General Assembly intended a just and reasonable result and is overly broad in light of the provision's legislative history.

Workers' compensation laws establish the scope and extent of liability. *See* Larson, *supra*, §§ 1.02, 1.03. The legislation protects both the employer's interest in minimizing financial risk as well as the injured employ-

ee's interest in equitable compensation. As the ICAO found, there is no dispute in these cases that the claimants were physically capable of performing modified employment when they terminated their injury-related employment. Subsequent to termination, Anderson engaged in modified work with another employer. However, a worsened condition rendered him unable to perform the job. Similarly, after he left the modified employment, Krause experienced a worsened condition that required surgery and prevented him from returning to any work. In both situations, because the worsened condition and not the termination of employment caused the wage losses, the ICAO concluded the claimants were entitled to TTD benefits.

In reviewing the administrative agency's interpretation of its own enabling statute, we give considerable weight to the agency's construction of the statute while reviewing it de novo. *Davison,* 84 P.3d at 1023. Here, the ICAO decisions are in accord with the legislative history and stated purposes of the Workers' Compensation Act to assure "the quick and efficient delivery of disability and medical benefits to injured workers." § 8–40–102(1), C.R.S. (2004).

In its brief to this Court, the ICAO observes that "[t]he practical effect of the Court of Appeals decision is that once an employee is injured, he or she may not leave employment with that employer without the risk of forever losing disability benefits if the injury worsens." We agree. The court of appeals construction of the statute would not only deprive these two employees of benefits they are entitled to receive under the Act, it would also have the effect of freezing the job market by penalizing employees for seeking to improve their job situation by working for another employer, moving out of town, or shortening their work hours because of familial considerations.[5] The General Assembly did not intend such a result; it was concerned about abuse of the modified employment and injury compensation goals of the

Act, not with intimidating employees into staying at their present employment.

## III.

Accordingly, we reverse the judgments of the court of appeals and uphold the ICAO rulings. We remand these cases for further proceedings consistent with this opinion.

Justice COATS dissents.

Justice COATS, dissenting.

Unlike the majority, I do not believe the history of sections 8–42–103(1)(g) and –105(4), C.R.S. (2004), suggests, even remotely, a legislative intent to require the payment of TTD benefits, by former employers, for work-related injuries that only become disabling after the employee has chosen to quit his job. Perhaps even more importantly, however, I do not believe the language of the statute itself admits of any such construction. And while I wholly agree with the court of appeals that these provisions were enacted for the express purpose of overturning our holding in *PDM Molding,*[6] I do not understand our holding in that case, even if (as now appears to be the case) the legislature was unsuccessful in overturning it, to sanction the majority's action today. Whether one finds the court's policy justification convincing or not, it clearly endorses a view of workers' compensation, as a species of social insurance, that I believe was never intended by the General Assembly.

The single sentence, added in two separate locations in the wake of *PDM Molding,* is simple enough: "In cases where it is determined that a temporarily disabled employee is responsible for termination of employment, the resulting wage loss shall not be attributable to the on-the-job injury." §§ 8–42–103(1)(g) and –105(4). From its context and timing, and testimony at the hearings, the amendment was clearly designed to address the holding of *PDM Molding*—that despite

5. The court of appeals held that section 8–42–105(4) "is to be construed as a permanent bar to receipt of temporary disability benefits when a claimant is responsible for his or her separation from employment and the separation is for causes within the employee's control, but unre-

lated to the industrial injury." *Longmont Toyota,* 85 P.3d at 551.

6. *PDM Molding, Inc. v. Stanberg,* 898 P.2d 542 (Colo.1995).

quitting or being fired for cause, an employee was nevertheless entitled to disability benefits, as long as a job-related injury was at least a contributing factor in his termination and consequent loss of wages. *See PDM Molding,* 898 P.2d at 547. By contrast with our holding, the statute now mandates that if an employee is found responsible for his own termination, the wage loss resulting from that termination cannot be attributed to a prior injury, regardless of any role that injury may have also played.

Notwithstanding the majority's declaration of ambiguity, the words "resulting wage loss," which follow immediately after "termination of employment," can only refer to the loss of wages suffered upon termination "from the employment out of which the injury arises," *id.,* not a subsequent termination from later employment. Whatever the cause of the employee's termination—a factual matter to be resolved in each case—the wage loss to which the statute refers is unambiguous. If the employee is responsible for his own termination from the employment out of which his injury arises, his resulting wage loss can no more be attributed to a subsequent worsening of his condition than to his on-the-job injury in the first instance. Despite the contrived reading of the ICAO to the contrary, *see* maj. op. at 326, the language of the statute simply does not permit an exception for a wage loss that "would have occurred," whether or not the employee voluntarily quit or was at fault. Whether those voting for the amendment envisioned fact scenarios like those before the court today or not, the amendment could not more clearly express a legislative intent that responsibility for one's own termination be dispositive of the cause of his resulting wage loss.

Even if the language of the amendment actually were ambiguous and could be construed to permit an exception for worsening conditions, no legislative history suggests an intent to create such an exception. As the majority points out, the subject of worsening condition claims came up only once during hearings on the bill, maj. op. at 329–30, and the short comment quoted by the majority, from a representative of an entity supporting passage of the bill, apparently addressed itself only to the procedure for reopening an award, rather than the cause of a wage loss suffered upon termination for which the employee was responsible. In any event, a lone comment, made during a committee hearing, by a supporter rather than a drafter, sponsor, or even legislator voting on the bill, does not legislative history make. On the contrary, the only meaningful legislative history of these amendments—the clear motivation to overturn a particular court ruling and the nature of the ruling to be overturned—demonstrates a legislative intent to end the practice of further case-by-case inquiry into contributing factors, once an employee's responsibility for his own termination has been established.

It is hardly surprising, however, that discussion of a bill openly designed to overturn the holding of *PDM Molding* would not address wage loss from a subsequent employer because even *PDM Molding* never recognized an entitlement to benefits as a result of an employee's incapacity to find or keep employment from a different employer. To have done so, as the majority does today, would have amounted to a substantial (if subtle) departure from the philosophy of our workers' compensation scheme. Rather than a system of compensation for employees who become unable to perform work for their employer as the result of on-the-job injuries, the scheme is converted into one in which an employer takes on the obligation of insuring that his employees will not lose their ability to earn a comparable wage in the work force generally, as the result of on-the-job injury. If it were not already clear, I believe these amendments demonstrate an incontrovertible legislative intent that an employer in this jurisdiction not be required to bear the risk that former employees who have voluntarily left his employ in search of better opportunities may, at some point in time, be administratively determined to be incapable, as the result of a previous on-the-job injury, of finding or keeping comparable-paying employment with another employer.

Notwithstanding the majority's paean to legislative intent, whenever a straightforward interpretation of words chosen by the legislature itself is rejected on the grounds that it

"is contrary to the presumption that the General Assembly intended a just and reasonable result," maj. op. at 330, one must at least question whether it is actually the intent of the legislature being discovered. Because I do not believe the words of the amendment admit of the construction given them by the majority, or that legislative history would support such a construction if they did, I respectfully dissent.