2012 COA 121

**COLORADO MEDICAL SOCIETY, a Colorado nonprofit corporation; and Colorado Society of Anesthesiologists, a Colorado nonprofit corporation, Plaintiffs–Appellants,**

v.

**John HICKENLOOPER, in his official capacity as the Governor of Colorado, Defendant–Appellee,**

and

**Colorado Association of Nurse Anesthetists; Colorado Nurses Association; and Colorado Hospital Association, Intervenors–Appellees.**

**No. 11CA1005.**

Colorado Court of Appeals, Div. II.

July 19, 2012.

Hershey Skinner, LLC, Kari Hershey, Littleton, Colorado, for Plaintiff–Appellant Colorado Medical Society.

Sherman & Howard, L.L.C., Joseph J. Bronesky, Frederick Y. Yu, Jason C. Miller, Denver, Colorado, for Plaintiff–Appellant Colorado Society of Anesthesiologists.

John W. Suthers, Attorney General, Matthew D. Grove, Assistant Attorney General, LeeAnn Morrill, Assistant Attorney General, Denver, Colorado, for Defendant–Appellee.

Miles & Peters, P.C., Frederick Miles, Peggy E. Kozal, Denver, Colorado, for Intervenor–Appellee Colorado Association of Nurse Anesthetists.

Caplan and Earnest LLC, Linda Sideruis, W. Stuart Stuller, Toni J. Wehman, Boulder, Colorado, for Intervenor–Appellee Colorado Nurses Association.

Polsinelli Shughart PC, Gerald A. Niederman, Bennett L. Cohen, Denver, Colorado, for Intervenor–Appellee Colorado Hospital Association.

Hogan Lovells U.S. LLP, Christopher O. Murray, Denver, Colorado, for Amicus Curiae American Hospital Association.

Kennedy Childs P.C., John R. Mann, Denver, Colorado, for Amici Curiae American Society of Anesthesiologists and American Medical Association.

Opinion by Judge ROTHENBERG.*

¶ 1 Plaintiffs, Colorado Medical Society and Colorado Society of Anesthesiologists (collectively, Doctors), appeal the district court's order dismissing their complaint for failure to state a claim against defendant, John Hickenlooper, in his official capacity as the Governor of Colorado (Governor). Intervenors, Colorado Association of Nurse Anesthetists, Colorado Nurses Association, and Colorado Hospital Association (collectively, Nurses), joined the Governor's motion to dismiss.

¶ 2 At issue in this case is whether Colorado law permits certified registered nurse anesthetists (CRNAs) to administer anesthesia without supervision by a physician, and therefore authorizes the Governor to opt out of the physician supervision requirement for purposes of the Social Security Act. We conclude the delivery of anesthesia by a CRNA *without* physician supervision is consistent with state law, and therefore the Governor had authority to opt out of the physician supervision requirement. Accordingly, we affirm the trial court's order.

I. Background and Procedural History

¶ 3 Under the Social Security Act, ambulatory surgical centers, hospitals, and critical access hospitals must fulfill certain conditions of participation to receive Medicare reimbursement. One condition is that CRNAs administering anesthesia must be supervised by a physician. 42 C.F.R. § 416.42 (ambulatory surgical center); 42 C.F.R. § 482.52 (hospital); 42 C.F.R. § 485.639 (critical access hospital).

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2011.

¶ 4 However, states may opt out of the physician supervision requirement if "the State in which the [facility] is located submits a letter to [the Centers for Medicare and Medicaid Services] signed by the Governor, following consultation with the State's Boards of Medicine and Nursing, requesting exemption from physician supervision of CRNAs." 42 C.F.R. §§ 416.42(c)(1), 482.52(c)(1), 485.639(e)(1). The letter from the Governor must attest that the Governor consulted the Boards and concluded that the opt-out "is in the best interests of the State's citizens" and "consistent with State law." 42 C.F.R. §§ 416.42(c)(1), 482.52(c)(1), 485.639(e)(1).

¶ 5 Fifteen states other than Colorado have opted out of the federal requirement that CRNAs be supervised by physicians. They are Alaska, California, Idaho, Iowa, Kansas, Minnesota, Montana, Nebraska, New Hampshire, New Mexico, North Dakota, Oregon, South Dakota, Washington, and Wisconsin. *See Cal. Soc'y of Anesthesiologists v. Superior Court,* 204 Cal.App.4th 390, 397 n. 4, 138 Cal.Rptr.3d 745, 748 n. 4 (2012).

¶ 6 On July 29, 2010, former Governor Bill Ritter, Jr. sent a letter to the Colorado Medical Board (Medical Board) and the Colorado Board of Nursing (Nursing Board) requesting advice whether an opt-out would be consistent with Colorado law and in the best interests of Colorado residents. In August 2010, both the Medical Board and the Nursing Board recommended the opt-out.

¶ 7 On September 27, 2010, Governor Ritter notified the Centers for Medicare and Medicaid Services by letter that he had consulted with the Medical Board and the Nursing Board and had determined the opt-out was consistent with Colorado law and in the best interests of Colorado citizens. Consequently, he exercised the opt-out as to all critical access hospitals in Colorado and thirteen specifically identified rural general hospitals. Later, he added a fourteenth rural general hospital to the opt-out.

¶ 8 On September 28, 2010, the Doctors filed this action for declaratory relief contending the opt-out was inconsistent with Colorado law. The Doctors also requested injunctive relief ordering the Governor to withdraw the opt-out. The Colorado Hospital Association, Colorado Nurses Association, and Colorado Association of Nurse Anesthetists intervened. Governor Hickenlooper filed a motion to dismiss, in which the intervenors joined.

¶ 9 On April 8, 2011, the district court granted the Governor's motion to dismiss and thus upheld his decision that Colorado statutes and regulations permit the delivery of anesthesia by a CRNA without physician supervision.

¶ 10 The Doctors now appeal. On appeal, amici curiae briefs were filed by the American Society of Anesthesiologists and American Medical Society supporting the position taken by the Doctors, and by the American Hospital Association supporting the position taken by the Governor and the Nurses.

## II. Is the Governor's Decision Subject to Judicial Review?

¶ 11 Initially, we address a contention that was raised only by the Hospital Association: namely, that the Governor's decision to opt out of the Medicare requirement is a "decision committed to the political branches and is not subject to judicial review." We disagree.

¶ 12 "The nonjusticiability of a political question is primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. 186, 210, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962); *see Lobato v. State,* 218 P.3d 358, 368–71 (Colo.2009) (applying the political question doctrine in Colorado). "A controversy is nonjusticiable—i.e., involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it....'" *Nixon v. United States,* 506 U.S. 224, 228, 113 S.Ct. 732, 122 L.Ed.2d 1 (1993) (quoting *Baker,* 369 U.S. at 217, 82 S.Ct. 691); *see Gilligan v. Morgan,* 413 U.S. 1, 9–10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (discussing justiciability).

¶ 13 In Colorado, "[t]he judiciary's avoidance of deciding political questions finds its roots in the Colorado Constitution's provi-

sions separating the powers of state government." *Colo. Common Cause v. Bledsoe,* 810 P.2d 201, 205 (Colo.1991) (citing Colo. Const. art. III); *see Lobato,* 218 P.3d at 368. "The three branches 'shall cooperate with and complement, and at the same time act as checks and balances against one another but shall not interfere with or encroach on the authority or within the province of the other.' " *Lobato,* 218 P.3d at 372 (quoting *Smith v. Miller,* 153 Colo. 35, 40–41, 384 P.2d 738, 741 (1963)).

¶ 14 Here, we have found no "textually demonstrable constitutional commitment" that expressly or impliedly vests the Governor with the sole discretion to determine whether CRNAs may administer anesthesia without physician supervision. *Baker,* 369 U.S. at 217, 82 S.Ct. 691. Indeed, the Governor's authority to opt out of the Medicare requirement arises solely from federal regulations offering that option. However, these regulations specifically leave it to each state to determine whether the opt-out is consistent with its own state law.

¶ 15 We also note that the Doctors do not challenge the Governor's factual finding that opting out of the Medicare requirement is in the best interests of Colorado citizens, which arguably involves a policy question. The Doctors only challenge the Governor's above-stated action, which they contend violates state law, namely, the Nurse Practice Act, sections 12–38–101 to –133, C.R.S.2011 (the Act). Thus, this case involves the statutory construction of state law and whether the Medical Board and the Nursing Board correctly interpreted it.

¶ 16 For these reasons, we conclude our review of the Governor's decision "in no way infringes on the powers and duties of the coequal departments of our government" and is an issue " 'traditionally within the role of the judiciary to resolve.' " *Colo. Common Cause,* 810 P.2d at 206 (quoting *Colorado General Assembly v. Lamm,* 704 P.2d 1371, 1378 (Colo.1985)); *see Lobato,* 218 P.3d at 362 (rejecting argument that parents' challenge to the adequacy of Colorado's public school funding system presented a nonjusticiable political question).

## III. Standing

¶ 17 Nor are we persuaded by the Governor's argument that the Doctors lack standing to challenge the opt-out decision.

¶ 18 We review the question of whether a plaintiff has standing de novo. *Barber v. Ritter,* 196 P.3d 238, 245 (Colo.2008); *Ainscough v. Owens,* 90 P.3d 851, 855 (Colo.2004).

¶ 19 A court does not have jurisdiction over a case unless a plaintiff has standing to bring it. Thus, standing is a threshold issue the court must resolve before deciding a case on the merits. *Barber,* 196 P.3d at 245; *Ainscough,* 90 P.3d at 855. If the plaintiff does not have standing, the case must be dismissed. *State Bd. for Community Colleges v. Olson,* 687 P.2d 429, 435 (Colo.1984); *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

¶ 20 "In Colorado, parties to lawsuits benefit from a relatively broad definition of standing." *Ainscough,* 90 P.3d at 855. "[A] plaintiff has standing to sue if he or she has suffered an injury-in-fact to a legally protected interest." *Id.* at 856.

¶ 21 "To constitute an injury-in-fact, the alleged injury may be tangible, such as physical damage or economic harm, or intangible, such as aesthetic harm or the deprivation of civil liberties." *Barber,* 196 P.3d at 245–46. Thus, "[t]he injury in fact test does not require that the plaintiff demonstrate an economic injury. '[H]arm to intangible values is sufficient.' " *Rocky Mountain Animal Def. v. Colo. Div. of Wildlife,* 100 P.3d 508, 513 (Colo.App.2004) (quoting *Friends of Black Forest Reg'l Park, Inc. v. Bd. of County Comm'rs,* 80 P.3d 871, 877 (Colo.App.2003)).

¶ 22 "Like an injury-in-fact, a legally protected interest may be tangible or intangible." *Barber,* 196 P.3d at 246. "To be a 'legally protect interest' ... the interest the complainant seeks to protect must be arguably within the zone of interests to be protected." *Rocky Mountain Animal Def.,* 100 P.3d at 513. Therefore, "[w]hether the plaintiff's alleged injury was to a legally protected interest 'is a question of whether the plaintiff has a claim for relief under the constitution,

the common law, a statute, or a rule or regulation.'" *Barber,* 196 P.3d at 246 (quoting in part *Ainscough,* 90 P.3d at 856).

¶ 23 "In determining whether standing has been established, all averments of material fact in a complaint must be accepted as true." *State Bd. for Cmty. Colleges v. Olson,* 687 P.2d at 434.

¶ 24 Here, the Doctors alleged injuries to their medical licenses and reputations. These injuries are tangible (the economic harm suffered by anesthesiologists) and intangible (the deprivation of the statutory right to practice medicine and the diminution of their professional reputations) and concern a legally protected interest (the value of their medical licenses as established by the Medical Practice Act, §§ 12–36–101 to –140, C.R.S.2011). *See Ainscough,* 90 P.3d at 856.

¶ 25 The Doctors also alleged that the Governor's opt-out diminishes patient safety and that the doctor-patient relationship requires them to keep their patients free from harm. *See City of Greenwood Village v. Petitioners for Proposed City of Centennial,* 3 P.3d 427, 439 (Colo.2000) (third-party standing exists when there is a substantial relationship between the party before the court and the third party). These allegations satisfy standing as an injury-in-fact to patient safety and a legally protected interest in the Medical Practice Act's legislative declaration that "the people shall be properly protected against unauthorized, unqualified, and improper practice of the healing arts in this state." § 12–36–102(1), C.R.S.2011.

¶ 26 The district court concluded these allegations, taken as true, were sufficient to confer standing on the Doctors, and we agree.

IV.  Physician Supervision of CRNAs

¶ 27 Turning to the merits, the Doctors contend the district court erred in dismissing their complaint for failure to state a claim. They maintain that the Act requires physician supervision of CRNAs because under the Act (1) anesthesia is a medication; (2) medication is part of a medical plan; and (3) the administration of anesthesia is therefore a "delegated medical function" subject to

physician supervision. According to the Doctors, the legislative history of the Act also supports their reading. We disagree.

A.  Standard of Review

¶ 28 We review a trial court's ruling on a motion to dismiss de novo. *Colo. Ethics Watch v. Senate Majority Fund, LLC,* 2012 CO 12, ¶ 16, 269 P.3d 1248, 1253. We accept as true all averments of material fact contained in the complaint and view the allegations of the complaint in the light most favorable to the plaintiff. *Brossia v. Rick Constr., L.T.D. Liab. Co.,* 81 P.3d 1126, 1129 (Colo. App.2003).

¶ 29 C.R.C.P. 12(b)(5) motions to dismiss for failure to state a claim are looked upon with disfavor. Thus, a complaint should not be dismissed unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *Sweeney v. United Artists Theater Circuit, Inc.,* 119 P.3d 538, 539 (Colo.App.2005). But if the plaintiff is not entitled to relief upon any theory of the law, the complaint should be dismissed for failure to state a claim. *Pub. Serv. Co. v. Van Wyk,* 27 P.3d 377, 385–86 (Colo.2001).

¶ 30 Statutory interpretation is a question of law which we review de novo. *Smith v. Exec. Custom Homes, Inc.,* 230 P.3d 1186, 1189 (Colo.2010). When interpreting a statute, we are guided by several principles.

¶ 31 First, our task is to give effect to the intent of the General Assembly, *Colo. Office of Consumer Counsel v. Pub. Utils. Comm'n,* 42 P.3d 23, 27 (Colo.2002), and we avoid interpreting a statute in a way that would defeat its intent. *Klinger v. Adams Cnty. Sch. Dist. No. 50,* 130 P.3d 1027, 1031 (Colo. 2006). Second, we construe statutory language in a manner that gives effect to every word, and we also consider the language in the context of the statute as a whole. *See Anderson v. Longmont Toyota, Inc.,* 102 P.3d 323, 327 (Colo.2004). Third, where the language of a statute is clear and unambiguous, we do not resort to other rules of statutory interpretation. *Klinger,* 130 P.3d at 1031. It is only where the language is ambiguous that we rely on other factors, such as

legislative history, the consequences of a given construction, and the end to be achieved by the statute. *Id.; Anderson,* 102 P.3d at 327. Fourth, we avoid interpreting a statute in a manner that produces an illogical or absurd result. *Smith,* 230 P.3d at 1190. Fifth, "[i]f a conflict between two statutory provisions is irreconcilable, a special or local provision prevails as an exception to a general provision, unless the general provision is the later adoption and the legislative intent is that the general provision prevail." *Martin v. People,* 27 P.3d 846, 860 (Colo.2001). Finally, in interpreting a statute, we give deference to the interpretation adopted by the agency charged with enforcing the statute. *Tryon v. Colo. State Bd. of Nursing,* 989 P.2d 216, 218 (Colo.App.1999).

### B. Colorado Law Governing CRNAs

¶ 32 The legislative declaration of the Act states that "in order to safeguard the life, health, property, and public welfare of the people of this state ... it is necessary that a proper regulatory authority be established" and it is "the policy of this state to regulate the practice of nursing through a state agency with the power to enforce the provisions of this article." § 12–38–102, C.R.S.2011.

¶ 33 The practice of nursing in Colorado is governed by the Act, which sets standards for licensing nurses and establishes the Nursing Board to regulate nurse practice. § 12–38–104, C.R.S.2011 (creating the Nursing Board); § 12–38–111, C.R.S.2011 (professional nurse licensure); § 12–38–111.5, C.R.S.2011 (advanced practice nurse registration). The Nursing Board issues rules and regulations covering the day-to-day practice of nurses in Colorado. *See* § 12–38–108, C.R.S.2011.

¶ 34 The " '[p]ractice of professional nursing' means the performance of both independent nursing functions and *delegated medical functions* in accordance with accepted practice standards." § 12–38–103(10)(a), C.R.S. 2011 (emphasis added).

¶ 35 A "delegated medical function" means *an aspect of care that implements and is consistent with the medical plan as prescribed by a licensed or otherwise legally authorized physician,* podiatrist, or dentist and is delegated to a registered professional nurse or a practical nurse by a physician, podiatrist, dentist, or physician assistant. For purposes of this [definition], "medical plan" means a written plan, verbal order, standing order, or protocol, whether patient specific or not, that authorizes specific or discretionary medical action, which may include but is not limited to the selection of medication. Nothing in this [definition] shall limit the practice of nursing as defined in this article.
§ 12–38–103(4), C.R.S.2011 (emphasis added).

¶ 36 When a nurse performs a delegated medical function, physician supervision is required. § 12–38–103(12), C.R.S.2011 (" 'Treating' means the selection, recommendation, execution, and monitoring of those nursing measures essential ... to the execution of delegated medical functions. Such delegated medical functions shall be performed under the responsible direction and supervision of a person licensed under the laws of this state to practice medicine, podiatry, or dentistry."). The term "independent nursing function" is not defined in the Act.

¶ 37 The Act defines the "practice of advanced practice nursing" as "an expanded scope of professional nursing in a scope, role, and population focus approved by the board, with or without compensation or personal profit, and includes the practice of professional nursing." § 12–38–103(8.5)(a), C.R.S. 2011.

¶ 38 To become an advanced practice nurse, a professional nurse must undergo specialized education and training in the field for which he or she wishes to become an advanced practice nurse. § 12–38–111.5(4), C.R.S.2011. All advanced practice nurses are required to "practice in accordance with the standards of the appropriate national professional nursing organization and have a safe mechanism for consultation or collaboration with a physician or, when appropriate, referral to a physician." § 12–38–111.5(6), C.R.S.2011.

¶ 39 A CRNA is an advanced practice nurse under the Act, § 12–38–111.5(2), C.R.S.2011, which means "a professional

nurse who is licensed to practice pursuant to this article, who obtains specialized education or training as provided in this section, and who applies to and is accepted by the board for inclusion in the advanced practice registry." *See* § 12–38–111.5(3), C.R.S.2011 (listing CRNAs as advanced practice nurses).

¶ 40 The Doctors urge us to conclude the Act allows CRNAs to administer anesthesia only with physician supervision. However, we perceive several problems with the Doctors' interpretation.

¶ 41 First, a CRNA would never administer treatment, including anesthesia, unless he or she was implementing a medical plan or acting in a manner that was consistent with a physician's medical plan. Thus, under the Doctors' interpretation, virtually every function performed by a CRNA could be characterized as "a delegated medical function" requiring supervision by a physician. For this reason, the district court concluded the Doctors' interpretation "cuts way too broadly." We agree.

¶ 42 The Doctors' interpretation also renders other portions of the Act meaningless. For example, section 12–38–111.5(6) requires that each advanced practice nurse "have a safe mechanism for consultation and collaboration with a physician, or, when appropriate, referral to a physician." However, this subsection of the Act would be superfluous if a CRNA were permitted to administer anesthesia only under a physician's supervision. *See Anderson,* 102 P.3d at 327 (requiring that courts read the statute as a whole); *Skyland Metropolitan Dist. v. Mountain W. Enter., LLC,* 184 P.3d 106, 117 (Colo.App. 2007) (requiring that courts avoid interpretations that would render a clause meaningless).

¶ 43 The Act also defines "the practice of professional nursing" as "the performance of independent nursing functions *and* delegated medical functions." § 12–38–103(10)(a). This recognizes that there are independent functions that are different from delegated medical functions.

¶ 44 The Act does not define "independent nursing functions," but it defines the "practice of advanced practice nursing" as "an expanded scope of professional nursing in a scope, role, and population focus *approved by the [Nursing] board.*" § 12–38–103(8.5)(a) (emphasis added). The Nursing Board's regulation defines "advanced practice nursing" as "[t]he expanded scope of nursing practice in an advanced Role and/or Population Focus approved by the Board." 3 Code Colo. Regs. 716–1:XIV–1.3 (2012). "Role" is defined as "[t]he advanced practice area or position for which the professional nurse has been prepared; Nurse Practitioner (NP)[,] Certified Registered Nurse Anesthetist (CRNA), Certified Nurse Midwife (CNM) and Clinical Nurse Specialist (CNS)." 3 Code Colo. Regs. 716–1:XIV–1.11 (2012).

¶ 45 The Nursing Board regulations provide that the scope of advanced practice nursing is based on "[t]he professional nurse's scope of practice within the [advanced practice nurse's] Role and Population Focus" and "[g]raduate and post-graduate nursing education in the Role and/or Population Focus for which the [advanced practice nurse] has been recognized by the Board for inclusion on the [advanced practice registry]." 3 Code Colo. Regs. 716–1:XIV–4.2 (2012).

¶ 46 The rules of statutory interpretation cited earlier require us to read these provisions together and to harmonize them to the extent possible. To the extent harmonization is not possible, the more specific provisions governing advanced practice nurses control. We are also guided by the General Assembly's stated intent to allow the Nursing Board to determine the scope of practice for advanced practice nurses. *See* § 12–38–102 (legislative declaration); § 12–38–111.6(8)(a), C.R.S.2011 ("The scope of practice for an advanced practice nurse may be determined by the board in accordance with this article.").

¶ 47 We also find persuasive the standards for Hospitals and Health Facilities promulgated by the Colorado State Board of Health, which provide that anesthesia may be administered only by a qualified physician "*or a registered nurse anesthetist graduated from a certified school.*" 6 Code Colo. Regs. 1011–1:IV17.101(2) (2012) (emphasis added). An earlier version of this standard required

physician supervision of a CRNA, but that language was deleted in 2003 after full public comment.

¶ 48 For these reasons, we conclude that CRNAs who administer anesthesia are conducting independent nursing functions within the scope, role, and population focus that the Nursing Board has approved for them. They are not conducting delegated medical functions and therefore do not require physician supervision.

¶ 49 In reaching our conclusion, we do not minimize the able arguments made by the Doctors and amici curiae that anesthesiologists receive considerably more education and training than nurse anesthetists, and therefore are much better equipped to respond to emergencies and unexpected difficulties during surgery.

¶ 50 However, our role is limited to determining whether Colorado law *permits* CRNAs to administer anesthesia without physician supervision. We may not pass on the wisdom of the decision to allow CRNAs to do so. As the court observed in *California Society of Anesthesiologists*:

> [T]he result of the opt out is that … hospitals, critical access hospitals, and ambulatory surgery centers are exempted from federal rules making physician supervision a prerequisite for Medicare reimbursements. Whether physicians should supervise CRNA's, or whether CRNA's should be used at all, are questions that have to be decided by each individual medical facility because "hospitals can always exercise stricter standards than required by State law." (66 Fed. Reg. 56762, 56765 (Nov. 13, 2001).) Accordingly, a hospital or other medical facility may require physician supervision of CRNA's if it deems it appropriate, irrespective of the state's opt out. The Governor's opt-out decision merely gives … facilities the option of using CRNA's to administer anesthesia without physician supervision without jeopardizing their Medicare reimbursements.

204 Cal.App.4th at 397–98, 138 Cal.Rptr.3d at 748–49 (footnote omitted).

## C. Captain of the Ship Doctrine

¶ 51 The Doctors next contend their reading of the Act is appropriate because the common law "captain of the ship" doctrine subjects physicians to vicarious liability for the acts of CRNAs. Again, we disagree.

¶ 52 The captain of the ship doctrine is a common law doctrine that holds physicians vicariously liable for the actions of others in an operating room. *See Ochoa v. Vered*, 212 P.3d 963, 966 (Colo.App.2009) ("The captain of the ship doctrine, which is grounded in respondeat superior, imposes vicarious liability on a surgeon for the negligence of hospital employees under the surgeon's control and supervision during surgery."); *Beadles v. Metayka*, 135 Colo. 366, 370–71, 311 P.2d 711, 713–14 (1957).

¶ 53 The Doctors are correct that this doctrine only applies when the surgeon has the right to supervise and control other personnel who are present in the operating room. *Ochoa*, 212 P.3d at 966. Thus, if CRNAs are not supervised by the Doctors, injured patients will need to seek redress from the CRNAs who were present in the operating room.

¶ 54 However, the General Assembly addressed the problem of inadequate redress for injured patients by requiring that CRNAs carry professional liability insurance. § 12–38–111.8(1), C.R.S.2011 ("It is unlawful for any advanced practice nurse engaged in an independent practice of professional nursing to practice within the state of Colorado unless the advanced practice nurse purchases and maintains or is covered by professional liability insurance in an amount not less than five hundred thousand dollars per claim with an aggregate liability for all claims during the year of one million five hundred thousand dollars."); *see Vigil v. Franklin*, 103 P.3d 322, 329 (Colo.2004) ("[w]here the interaction of common law and statutory law is at issue, we acknowledge and respect the General Assembly's authority to modify or abrogate common law").

¶ 55 We acknowledge the Doctors' argument that the amount of professional liability insurance for CRNAs is only half the amount required of physicians. Nevertheless, the

General Assembly has apparently determined that individuals injured by CRNAs have reasonable options available to them.

¶ 56 We therefore conclude the captain of the ship doctrine does not require a different result.

### V. Conclusion

¶ 57 We conclude the Governor and the district court did not err in determining that, under the Act, CRNAs may lawfully administer anesthesia without physician supervision and that such activity is not inconsistent with Colorado law. Accordingly, the court did not err in dismissing the complaint.

¶ 58 Given our conclusion, we need not address the Nurses' alternative grounds for affirmance.

¶ 59 Order affirmed.

Judge CASEBOLT concurs.

Judge FURMAN specially concurs.

Judge FURMAN specially concurring.

¶ 60 I write separately because I think plaintiffs lack standing in this case. Plaintiffs seek an injunction requiring the Governor to withdraw his request to opt out of the physician supervision requirement of the Social Security Act and preventing the Governor from requesting an opt-out in the future. Since plaintiffs have not alleged injuries to any legally protected interests so as to give them a claim for relief, I think the prudential doctrine of standing should apply to forestall examination of the merits of this case.

¶ 61 Standing is a "threshold issue that must be satisfied in order to decide a case on the merits." *Ainscough v. Owens,* 90 P.3d 851, 855 (Colo.2004). "If the plaintiff does not have standing, the case must be dismissed." *Hotaling v. Hickenlooper,* 275 P.3d 723, 725 (Colo.App.2011) (citing *State Bd. for Cmty. Colls. v. Olson,* 687 P.2d 429, 435 (Colo.1984)).

¶ 62 To establish standing, a plaintiff in Colorado must have suffered an "injury-in-fact" to a "legally protected interest." *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

¶ 63 In my view plaintiffs have established neither that they suffered an injury-in-fact nor that any interests that they allege have been injured by the Governor's actions were legally protected.

### I. Injury–in–Fact

¶ 64 I think plaintiffs have not established that they have suffered an injury-in-fact because their claimed injuries (specifically, injuries to their interests in their medical licenses, their reputations, and public health) are indirect and incidental to the Governor's actions.

¶ 65 The purpose of the "injury-in-fact" prong of standing is "to maintain the separation of powers of state government, and to prevent the courts from assuming the powers of another branch by deciding something that is not the result of an actual case or controversy." *Freedom from Religion Found., Inc. v. Hickenlooper,* 2012 COA 81, ¶ 45, —— P.3d ——, ——. An injury-in-fact "is conveyed by neither the remote possibility of a future injury nor an injury that is overly 'indirect and incidental' to the defendant's action." *Ainscough,* 90 P.3d at 856.

¶ 66 I note that the Governor's opt-out has no bearing on the legal standards governing who may administer anesthesia or under what circumstances anesthesia may be administered. These standards are defined by Colorado law. *See, e.g.,* §§ 12–38–101 to –133, C.R.S.2011 (Colorado's Nurse Practice Act). Hence, plaintiffs cannot claim that their medical licenses, their reputations, or public health have in some way been diminished; Colorado law regarding the practice of medicine is not changed by the Governor's funding decision.

¶ 67 Further, I think any possible confusion or misunderstanding in the medical profession caused by the Governor's opt-out is indirect and incidental to the Governor's actions. *Ainscough,* 90 P.3d at 856.

### II. Legally Protected Interests

¶ 68 I also think plaintiffs have not established that their interests allegedly injured by the Governor's actions are legally protect-

ed so as to afford them a claim for relief in this case.

¶ 69 Whether a plaintiff has a legally protected interest for standing purposes is "a question of whether the plaintiff has a claim for relief under the constitution, the common law, a statute, or a rule or regulation." *Ainscough,* 90 P.3d at 856 (citing *Bd. of Cnty. Comm'rs v. Bowen/Edwards Assocs., Inc.,* 830 P.2d 1045, 1053 (Colo.1992)). Moreover, "the interest sought to be protected by the complainant" must arguably be "within the zone of interests to be protected" by the rule of law in question. *Friends of Black Forest Reg'l Park, Inc. v. Bd. of Cnty. Comm'rs,* 80 P.3d 871, 877 (Colo.App.2003) (quoting *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,* 522 U.S. 479, 492, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998)).

¶ 70 On this point, I note first that plaintiffs have identified no constitutional provision, common law, or statute, either state or federal, which would give them a claim for relief in the circumstances of this case. *See Ainscough,* 90 P.3d at 856; *see also Conrad v. City & Cnty. of Denver,* 656 P.2d 662, 668–69 (Colo.1982)(taxpayer's interest in preventing the government from showing religious preference was legally protected when it was secured by the Religious Preference Clause of the Colorado Constitution).

¶ 71 Plaintiffs' only cognizable claim is that the Governor's actions were somehow inconsistent with 42 C.F.R. § 416.42(c)(1), a federal regulation setting out the procedure for opting out of the physician supervision requirement. Plaintiffs, however, have presented no argument as to how this federal regulation was actually violated or was intended to protect their interests.

¶ 72 42 C.F.R. § 416.42(c)(1) states as follows:

[A State] may be exempted from the requirement for physician supervision of CRNAs ... if the State ... submits a letter to [the Centers for Medicare and Medicaid Services] signed by the Governor, following consultation with the State's Boards of Medicine and Nursing, requesting exemption from physician supervision of CRNAs. The letter from the Governor must attest that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law.

¶ 73 I think the plain meaning of the federal regulation requires that, to opt-out, the Governor need only attest that (1) he has consulted with the appropriate boards and (2) he has "concluded" that the opt-out is in the best interests of Colorado's citizens and consistent with Colorado law. *See USA Tax Law Center, Inc. v. Office Warehouse Wholesale, LLC,* 160 P.3d 428, 431 (Colo.App. 2007)("[W]e interpret federal regulations in a manner that gives them effect according to their plain meaning.") (citing *Time Warner Entm't Co. v. Everest Midwest Licensee, L.L.C.,* 381 F.3d 1039 (10th Cir.2004)). Because this regulation only requires the Governor to attest that he has concluded that the criteria for opting out have been met, I think it gives the Governor the sole discretion to determine whether the opt-out is in the best interests of Colorado's citizens and consistent with Colorado law.

¶ 74 Considering that it is uncontested that the Governor consulted with the appropriate boards and thereafter concluded that the opt-out was in the best interests of Colorado's citizens and consistent with Colorado law, I think any argument by plaintiffs that the Governor has actually violated this regulation would be a mere pretense for challenging the Governor's exercise of discretion and, thus, should not confer standing. *See Conrad,* 656 P.2d at 668.

¶ 75 Further, even if plaintiffs assert that the Governor actually violated 42 C.F.R. § 416.42(c)(1), there is nothing to suggest that this regulation was intended to protect plaintiffs' interests, *see Friends of Black Forest,* 80 P.3d at 877, by affording them a private claim for relief. *See USA Tax Law Center,* 160 P.3d at 430 ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of

that person.") (quoting *Cannon v. Univ. of Chicago,* 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)). " 'Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.' " *Id.* (quoting *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001)). And, "[a]bsent statutory intent to create a private right of action, 'courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.' " *Id.* (quoting *Alexander,* 532 U.S. at 286–87, 121 S.Ct. 1511).

¶ 76 Plaintiffs have presented us with no analysis suggesting that 42 C.F.R. § 416.42(c)(1), a procedural regulation concerning funding under the Social Security Act, was intended to protect their interests by giving them a claim for relief. The regulation itself does not indicate that it was intended to afford anyone a private right of action, and nothing in the record suggests that it was. Hence, although plaintiffs claim injuries to their interests in their medical licenses, their reputations, and public health, they have not established that 42 C.F.R. § 416.42(c)(1), or any other rule of law, protects these interests in this case. *See Ainscough,* 90 P.3d at 856.

¶ 77 Finally, in my view, this case is before us simply because plaintiffs do not like the funding decision made by the Governor, but that is a decision that lies solely with the Governor under 42 C.F.R. § 416.42(c)(1). This case therefore stands as a prime example of the continuing relevance of the standing doctrine in ensuring the separation of powers by preventing the judiciary from usurping powers vested in the executive branch, *see Conrad,* 656 P.2d at 668, and I think that, if the standing doctrine is to have any force in Colorado, it must bar us from reaching the merits of cases such as this one.